

**ORDERED in the Southern District of Florida on May 23, 2022.**



**Peter D. Russin, Judge**
**United States Bankruptcy Court**

---

*Tagged Opinion*

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF FLORIDA
## FORT LAUDERDALE DIVISION

In re:

Case No. 21-12188-PDR

No Rust Rebar, Inc.,

Chapter 11

     Debtor.

_____/

### ORDER CONVERTING CASE TO CHAPTER 7

     Green Tech Development, LLC has asked the Court to either remove the principal of the Debtor or convert this case from a Chapter 11 to a Chapter 7.[1] The Court held a four-day evidentiary hearing on these matters. For the reasons that follow, the Court finds cause to convert the case or remove No Rust as the debtor in possession, and that conversion is in the best interest of the estate and its creditors.

---

[1] (Docs. 70; 116).

## Findings of Fact

In the 1980s, while operating a boat manufacturing and design business, Don Smith came into the possession of a significant amount of basalt fibers. Smith became fascinated with the material and believed that he could use it to create a replacement for traditional structural reinforcement products, such as rebar, with the advantage that basalt does not rust. However, Smith never patented the process and chose to maintain it in his own head because he was worried that he did not have the means to defend a patent. When the idea of using basalt fibers as structural reinforcement became less financially viable due to the crash of the housing market in the mid 2000s, Smith shifted his focus to the energy sector and founded Raw Energy Materials, Inc. ("REM"), which used basalt fibers to create products for the wind industry.[2]

REM struggled because it was unable to manufacture basalt fibers itself and its product was large, expensive, and time consuming to produce. Smith, therefore, turned his interest back to manufacturing and selling structural reinforcement products, particularly rebar, made from basalt fibers. At a Christmas party in 2014, Smith met Robert Bryan, who was fascinated by Smith's idea. In January 2015, following a $1.2 million investment from Bryan, No Rust Rebar, Inc. ("No Rust") was born. Though Bryan put no specific restrictions on Smith's use of the funds, he assumed they would be used exclusively for the benefit of No Rust and that the

---

[2] (Doc. 188 at 33:16–43:2, 45:2–18, 103:11–14).

company's additional funding needs for things like research and development would be minimal.[3]

No Rust initially needed to secure a manufacturing facility. Bryan suggested that No Rust buy a $3 million property he owned in Georgia. Smith declined. Instead, Smith was interested in a foreclosed industrial facility in Pompano Beach, Florida that contained office space, meeting rooms, and an industrial facility, but required significant repairs and maintenance (the "Property"). Bryan suggested he could purchase the Property and No Rust could lease it from him. Again, Smith declined. In July 2015, against the wishes of Bryan, No Rust contracted to purchase the Property for $450,000 and paid a non-refundable $50,000 deposit that allowed it to occupy the premises and begin maintenance and repairs immediately. Bryan, angry that he had been seemingly squeezed out of the deal for the Property, refused to provide No Rust with any further funding. Without additional investment from Bryan, No Rust lacked the funds to close and risked losing both the Property and its $50,000 deposit.[4]

Desperate for a solution, Smith turned to a friend, Joan Saperstein, for help. Saperstein created a new entity, Green Tech Development, LLC ("Green Tech") to which No Rust agreed to assign its right to purchase the Property. No Rust contends that consideration for the assignment included an option to purchase the Property

---

[3] (Docs. 1; 130-1; 130-2; 130-4; 138 at ¶ 1; 160 at 48:11–14; 170 at 52:4–56:4, 58:5–63:24, 81:4–16; 188 at 43:3–44:20).

[4] (Docs. 130-5; 160 at 15:18–24; 170 at 77:3–97:3, 106:16–110:11; 188 at 47:15–56:14, 78:9–79:13).

from Green Tech, but Green Tech contends there was no such option. Both parties agree that there is no signed written agreement memorializing the purported option. In January 2016, Green Tech bought the Property and No Rust remained in possession.[5]

No Rust needed permits and a business license before it could begin manufacturing operations on the Property. Though No Rust filled out the applications, it needed Green Tech, as the owner of the Property, to sign them. For reasons that remain unclear, Green Tech refused. According to Smith, Green Tech's refusal was part of a concerted effort by associates of Green Tech to extort him into taking out a $10 million loan.[6]

In May 2016, No Rust executed, but never recorded, a $400,000 mechanics lien against the Property in favor of another company Smith had recently created, Raw Materials Corp. ("RMC"). RMC was created by Smith in September 2015 to provide fiber and resin packages to his entities and also operated out of the Property. When pressed about why RMC received the mechanics lien, Smith acknowledged it was "protection" for his entities to make the Property "less enticing" to Green Tech. Shortly thereafter, Smith listed "No Rust Rebar, Inc." both as a fictitious name of RMC and as a d/b/a on RMC's bank account. Smith testified he did this so he could

---

[5] (Docs. 130-8; 188 at 63:14–66:2, 80:25–81:8).

[6] (Doc. 188 at 81:9–85:18).

transfer checks made payable to No Rust to RMC when he, in his discretion, believed doing so was appropriate.[7]

In November 2016, Smith sought to exercise No Rust's purported option by filing a Notice of Election to Purchase Real Property, but Green Tech refused to sell. Less than a month later, No Rust sued Green Tech for specific performance; Green Tech countered seeking No Rust's ejectment and damages for civil trespass (the "Property Dispute").[8]

In December 2016, Smith founded Raw, LLC ("Raw"), which served as a holding company. Then, in January 2017, Smith reinstated an older entity, Global Energy Sciences, LLC ("GES"), to hold his intellectual property, including the trademark and brand licenses associated with his basalt rebar product. However, it appears No Rust paid the bills for at least some of GES's intellectual property and, at least once, transferred a patent to GES for no consideration. No Rust is obligated to pay GES $200/day ($73,000 annually) for a license to produce basalt rebar, though Smith testified that payment has not been required recently given No Rust's financial situation.[9]

In February 2017, Smith used various entities to complete a deal with PayMeOn, Inc. ("PayMeOn"), a publicly traded company interested in the sale of

---

[7] (Docs. 130-7; 130-20; 131-9; 138; 160 at 50:21–54:22, 134:23–155:19; 162 at 107:13–108:4; 170 at 25:4).

[8] (Doc. 160 at 63:3–65:7); *see No Rust Rebar, Inc. v. Green Tech Dev., LLC (In re No Rust Rebar, Inc.)*, No. 21-01111-PDR (Bankr. S.D. Fla.); *Green Tech Dev., LLC v. No Rust Rebar, Inc. (In re No Rust Rebar, Inc.)*, No. 21-01112-PDR (Bankr. S.D. Fla.).

[9] (Docs. 130-7; 130-13; 130-14; 160 at 58:8–64:17, 80:3–85:23, 177:18–179:9).

Smith's basalt rebar (the "PayMeOn Deal"). Under the agreement, PayMeOn received an exclusive license to sell basalt rebar in Florida and the Caribbean. No Rust provided two machines, basalt fibers, and finished inventory to help close the deal, but in return received no consideration. RMC, however, received $2.4 million in cash and Raw received 10 million shares in PayMeOn.[10] In short, in exchange for No Rust's assets and No Rust losing its right to sell basalt rebar in Florida and the Caribbean, RMC received millions of dollars, Raw received millions of shares in a publicly traded company, and No Rust received nothing. Smith, however, contends that No Rust lost nothing because it was not presently selling product anyway and ultimately received reasonably equivalent value for the transaction in the form of new equipment and machinery.[11]

In 2019, the electric company cut the Property's power due to a split of the power source from the contiguous property; power has not been restored but a generator has provided some power. Since then, No Rust and the other entities operating from the Property have been severely limited in their ability to conduct any business at all.[12] Given that the Property is presently unusable for manufacturing and No Rust's rights to it were in dispute, No Rust could have chosen to lease another Property or take some other action to ramp up its prospective core business. However,

---

[10] Raw was also supposed to receive a consulting fee, but the testimony suggests that Raw received no cash and never held any assets other than the shares of PayMeOn stock. *See* (Docs. 131-18; 131-19; 160 at 62:8–64:17).

[11] (Docs. 131-18; 131-19; 160 at 62:8–64:17, 69:12–15, 93:24–95:10, 99:19–102:9, 105:6–108:12, 116:1–120:3, 121:11–127:25, 154:1–5; 162 at 39:21–49:12; 188 at 87:4–93:25).

[12] (Doc. 162 at 63:20–64:11).

Smith testified, in his business judgment, that was too expensive and not in No Rust's best interests.[13]

In September 2020, RMC registered "Raw, LLC" as a fictitious name. No explanation has been provided for this action. On March 5, 2021, No Rust registered "Raw, LLC" as a fictitious name. No explanation has been provided for this action either.[14]

On March 5, 2021, No Rust filed a voluntary bankruptcy petition under Subchapter V of Chapter 11 of the Bankruptcy Code.[15] There are irregularities in No Rust's Schedules, including:[16]

1.  RMC's checking account is not listed in the Schedules even though "No Rust Rebar, Inc." is listed as a d/b/a on the account and the account was open on the Petition Date. According to Smith, the failure to include the account was not a mistake because, despite being listed as a d/b/a on the account, No Rust has no interest in the account.[17]

2.  The 2020 tax returns provide that No Rust is due nearly $492,000 from RMC, but No Rust did not list that accounts receivable as an asset in the Schedules. When pressed, Smith was unable to provide a sufficient explanation for what the debt due to No Rust is for or why it was not included in the Schedules but did acknowledge it should have been.[18]

3.  The 2020 tax returns showed that No Rust had no inventory, but No Rust scheduled some inventory on the Schedules. Smith

---

[13] (Doc. 160 at 176:22–177:10).

[14] (Docs. 130-21; 131-6; 160 at 193:25–194:20).

[15] (Docs. 1; 130-21).

[16] (Docs. 19; 133-16; 173).

[17] (131-9; 160 at 144:10–155:19; 170 at 25:4).

[18] (Docs. 131-25; 160 at 199:16–203:9).

explained that the inventory was not listed based on any consideration of corporate documentation but was rather determined by walking around the building (which holds other corporate entities' assets) and identifying certain pieces of inventory to include.[19]

4.   No Rust scheduled a $129,250 debt owed to Smith's sister resulting from a loan she gave to Smith personally in 2005, roughly a decade before No Rust was incorporated. Smith states he agreed to carry the debt into No Rust because No Rust "is the entity that came to fruition out of [her] original seed monies."[20]

Shortly after the Petition Date, on March 29, 2021, No Rust removed several actions from state court to this Court, including the Property Dispute.[21] The Court denied cross motions for summary judgment in the Property Dispute and the matter remains pending.[22]

There are only six total claims in this case. Two are related to the Property Dispute: (1) Green Tech asserts a $1.95 million claim arising from damages related to the Property Dispute,[23] and (2) Pet Star Corp. asserts a $1.05 million conditional claim arising from its mortgage on the Property.[24] No Rust objects to both claims as contingent, unliquidated, and disputed.[25] The other claims in this case include, (1) a

---

[19] (Doc. 188 at 210:8–25).

[20] (Docs. 19 at 16; 160 at 191:21–193:4).

[21] *See No Rust Rebar, Inc. v. Green Tech Dev., LLC (In re No Rust Rebar, Inc.)*, No. 21-01111-PDR (Doc. 1) (Bankr. S.D. Fla. Mar. 29, 2021) (the "Property Dispute"); *Green Tech Dev., LLC v. No Rust Rebar, Inc. (In re No Rust Rebar, Inc.)*, No. 21-01112-PDR (Doc. 1) (Bankr. S.D. Fla. Mar. 29, 2021).

[22] *See No Rust Rebar, Inc. v. Green Tech Dev., LLC (In re No Rust Rebar, Inc.)*, No. 21-01111-PDR, 2021 WL 4314221 (Bankr. S.D. Fla. Sept. 22, 2021).

[23] (Claim 4-1).

[24] (Claim 3-1).

[25] (Docs. 123; 125).

$12,559.49 claim by the U.S. Small Business Administration,[26] (2) an $11,750.40 claim by Broward County for 2020 and 2021 tangible property taxes,[27] and (3) two claims by Broward County Water and Wastewater Services totaling $52,669.83 for services to the Property.[28]

On April 14, 2021, as part of a litigation settlement agreement related to the PayMeOn Deal, Raw agreed to sell its 10 million shares in PayMeOn to Basanite, Inc. for $1.2 million.[29] The deal was not disclosed, and no Court approval was sought for the transaction. Because Raw does not have its own bank account, the funds were remitted to Smith. Smith contends that, even though Raw is No Rust's fictitious name, the settlement was unrelated to No Rust and there was not a need to disclose the settlement or seek court approval for it.[30]

On June 3, 2021, No Rust submitted its Subchapter V Plan. In short, the Plan acknowledges that confirmation depends entirely on No Rust's success in the Property Dispute and states that, if No Rust loses or is removed as the debtor in possession, the case will automatically convert to a Chapter 7. If No Rust wins the case, however, No Rust states that Smith will personally contribute funds to allow No Rust to acquire the Property and, once No Rust's business ramps up, it will be

---

[26] (Claim 1-1).

[27] (Claim 2-2).

[28] (Claim 5-1; 6-1).

[29] Basanite appears to be a successor entity to PayMeOn.

[30] (Doc. 133-9; 133-10; 133-11; 160 at 55:8–18, 62:8–64:17, 70:19–23, 204:11–16; 162 at 49:13–53:23).

able to fund a 100% plan through its future earnings and contributions from Smith.[31] The Plan lacks any specificity with respect to the capital needed to fund it and offers no projections or proof of available financing for the purchase of the property or the ramp up of the business. The Plan is consistent with Smith's stated perspective on No Rust's prospects for success. He asserts that everything is resolved "when" he succeeds in obtaining the Property and making it operational for both No Rust and RMC. At present, however, he "can't get through the Court to get [the Property] that [No Rust] contracted for" and is, instead, "stuck in a quagmire."[32]

On June 7, 2021, the Court directed the Subchapter V Trustee to investigate No Rust and file a report in the bankruptcy case addressing whether Smith had breached any duties or fiduciary obligations and whether No Rust should be removed as debtor in possession. In the Report, the Subchapter V Trustee concluded that Smith did not appear to have breached his duties and No Rust should not be removed.[33]

Since the report, however, additional information has become available regarding Smith's entities—which he refers to as the "Family"—and the commingling of their assets.[34] Smith routinely transferred money amongst the Family at his sole

---

[31] (Doc. 56).

[32] (Doc. 160 at 203:17–204:1).

[33] (Doc. 59); *No Rust Rebar, Inc. v. Don Smith (In re No Rust Rebar, Inc.)*, No. 21-01131-PDR (Doc. 24) (Bankr. S.D. Fla. June 7, 2021).

[34] Smith used the "Family" to refer to No Rust, RMC, REM, and GES, but not Raw. For the Court's purposes, the Family refers to all of Smith's related entities, including Raw. *See* (Docs. 138; 160 at 31:3–7; 50:21–55:22, 192:21–193:4, 198:13–17).

discretion, his bookkeeper served as the bookkeeper for the whole Family, and whenever assets appeared commingled amongst the Family, Smith would simply rely on his financial professionals to sort out any issues or confusion that might arise. Smith also used the same emblem on every Family member's checks. Smith explained that the Family failed to maintain corporate formalities largely because the Family included closely held companies that he personally controlled, he lacked clerical help to separate the Family's assets and liabilities, and "things began to get mixed up" once he "began to spend huge amounts of legal fees."[35]

On August 5, 2021, Green Tech filed its *Motion for Removal of Debtor as Debtor in Possession* and, on November 21, 2021, filed its related *Motion to Convert Chapter 11 Case to Chapter 7*.[36] No Rust opposes the motions, arguing Green Tech lacks standing and has failed to satisfy the standards for removal or conversion.[37] The Court set an evidentiary hearing[38] and heard the *Motion for Removal*, the *Motion to Convert*, and the *Motion for Sanctions* on December 8, 2021, December 21, 2021, January 4, 2022, and January 10, 2022.[39] No Rust, Green Tech, and the Subchapter V Trustee submitted final briefs following the hearings.[40]

---

[35] (Docs. 130-20; 130-21; 131-6; 134-20; 160 at 16:18–17:1, 54:23–55:12, 87:25–93:5, 123:23–125:1, 128:21–133:11, 193:25–194:20, 207:7–209:10).

[36] (Docs. 70; 116).

[37] (Doc. 75).

[38] (Docs. 86; 141).

[39] (Docs. 160; 162; 170; 188).

[40] (Docs. 175; 176; 180).

At the hearings, the Subchapter V Trustee amended her position from the Report and recommended conversion. In addition to citing confusion and concern resulting from the commingling of Family assets and liabilities, the Subchapter V Trustee testified that No Rust failed to satisfy its duties as a debtor in possession to provide appropriate documentation, including bank statements, tax returns, and monthly operating reports.[41] Upon review of No Rust's present situation, the Subchapter V Trustee testified that, unlike Smith, she does not see No Rust as a manufacturing company, but rather as—at best—a real estate holding company currently embroiled in a dispute over its rights to its only (potential) asset. In her opinion, No Rust will not be able to produce sufficient income to become operable and fund a plan and will have to look for other avenues of business to survive. However, the Subchapter V Trustee did acknowledge that the recent collapse of a condominium in Surfside, Florida might provide a potential opportunity for No Rust to position its product as a better alternative to traditional structural reinforcement products. In her proposed findings and conclusions, consistent with her testimony, the Subchapter V Trustee recommended that the Court convert the case to a Chapter 7.[42]

---

[41] The Court previously found that No Rust's monthly operating reports were insufficient because they "fail[ed] to provide all the required financial information" and required that they be amended. (Doc. 77). No Rust amended the monthly operating reports, but the Subchapter V Trustee still testified at the evidentiary hearing, months after the amendments, that, even with the amendments, she was not privy to "fulsome monthly operating reports." *See* (Docs. 80–85; 160 at 37:4–7).

[42] (Docs. 160 at 17:8–21:25, 25:9–13; 28:17–30:14, 33:7–14; 180).

Following the evidentiary hearing, No Rust amended its schedules. The only change in the Amended Schedules appears to be that No Rust scheduled a $9,500 forklift that had previously been undisclosed.[43]

Presently, No Rust is not operating.[44]

## Jurisdiction & Venue

The Court's subject matter jurisdiction is derived from 28 U.S.C. § 1334. The Court has statutory authority to hear and determine this proceeding under 28 U.S.C. § 157(a) & (b)(2)(A), and the general order of reference from the United States District Court for the Southern District of Florida. *See, e.g.*, *In re State Street Houses, Inc.*, 305 B.R. 726 (Bankr. S.D. Fla. 2002). The Court has constitutional authority to enter final orders in this core proceeding. Venue is proper under 28 U.S.C. §§ 1408 and 1409.

## Conclusions of Law

Chapter 11 debtors operate as debtors in possession and, in general, "have all the rights . . . and powers, and shall perform all the functions and duties . . . of a trustee serving in a case under this chapter." 11 U.S.C. § 1107(a). If a party in interest believes that the Chapter 11 debtor should not be the debtor in possession any longer, they may, for cause, seek to either (1) covert the case from Chapter 11 reorganization to a Chapter 7 liquidation or (2) keep the case in Chapter 11, but appoint a trustee. *See* 11 U.S.C. §§ 1104(a), 1112(b), & 1185(a). Green Tech requests that the Court take

---

[43] (Doc. 173 at 7).

[44] (Doc. 160 at 16:1–17, 33:7–14).

such decisive action in this case. No Rust opposes the relief, arguing that Green Tech (1) lacks standing as a party in interest to seek conversion or removal, and (2) failed to establish sufficient cause.

## I.    <u>Standing</u>

A party must be a "party in interest" to have standing to request conversion of a Chapter 11 case or removal of the debtor as debtor in possession. *See* 11 U.S.C. §§ 1104(a), 1112(b), & 1185(a). Though 11 U.S.C. § 1109(b) contains a list of examples of parties in interest, "including the debtor, the trustee, a creditors' committee, an equity security holders' committee, a creditor, an equity security holder, or any indenture trustee," the list is not exclusive. *See* 11 U.S.C. § 102(3) (defining "including" and "includes" as "not limiting" as used under the Bankruptcy Code); *In re E.S. Bankest, L.C.*, 321 B.R. 590, 594 (Bankr. S.D. Fla. 2005). To be a party in interest in a matter arising in a Chapter 11 case, a party must merely have "a sufficient stake in the outcome . . . so as to require representation." *E.S. Bankest*, 321 B.R. at 595; *see also In re SFD @ Hollywood, LLC*, 411 B.R. 453, 455 (Bankr. S.D. Fla. 2009) ("A 'party in interest' under § 1109(b) is any person with a direct financial stake in the outcome of the case."); *In re Amatex Corp.*, 755 F.2d 1034, 1042 (3d Cir. 1985).

Green Tech holds title to the Property that No Rust currently possesses, asserts an interest in, and has declared to be the lynchpin of its entire bankruptcy case. In fact, No Rust has declared in its Plan and elsewhere that, if it loses the Property Dispute, it cannot reorganize and will simply convert the case. The Property Dispute consists of two lawsuits, both of which have been removed to this Court. The

first adversary proceeding, brought by No Rust, seeks to enforce the purported option; the second, brought by Green Tech, seeks ejectment of No Rust and damages for civil trespass. The Property Dispute was pending for years before No Rust filed for bankruptcy and removed the lawsuits here. As a result of the Property Dispute, Green Tech filed a $1.9 million proof of claim arising from alleged damages resulting from No Rust's filing a *lis pendens* on the Property and its continued occupancy of the Property.[45]

No Rust contends that Green Tech does not have standing because Green Tech's relationship with the bankruptcy case arises from the Property Dispute, and if No Rust prevails, that relationship will cease. In support, No Rust relies on *E.S. Bankest*, where the bankruptcy court concluded that a movant lacked standing to seek conversion where its sole relationship to the case was as a defendant in an adversary proceeding and the movant was only seeking conversion as a "litigation tactic" to delay or hinder prosecution of the adversary proceeding. *See E.S. Bankest*, 321 B.R. at 593, 596–99. No Rust argues:

> By displacing [No Rust] from management of this case, Green Tech sweeps aside its long-time adversary in litigation matters collectively pending for over a decade. And at what cost to the actual, undisputed, allowed claimants in this case? [No Rust] has filed a Plan in which it: waives discharge; pledges full payment to all non-insider creditors; provides for an immediate installment payment to non-insider unsecured creditors; requires Mr. Smith to infuse significant capital; prohibits management from taking a salary until all creditors are paid in full; leaves the Sub V trustee in control of all earnings and future income; and provides for conversion of the case to Chapter 7 if [No Rust] does not prevail in the Specific Performance Suit, or if Mr. Smith loses control over management of this case.

---

[45] (Claim 4-1).

. . .

> If Green Tech loses the Specific Performance Suit, it will have no claim in this case.
>
> If Green Tech prevails in the Specific Performance Suit, it may have a claim for [No Rust's] occupancy of the Property, but Green Tech will also have possession of all of [No Rust's] tangible assets, as well as the assets of non-debtor affiliates, and unaffiliated entities. All that would remain for unsecured creditors is awaiting the outcome of an investigation into the alleged recoveries through litigation by a trustee.[46]

No Rust's argument, however, seemingly complicates what is ultimately a relatively simple issue: whether Green Tech clearly has a sufficient interest in who controls the property of the estate "to require representation." It does.

Green Tech filed a proof of claim. Generally, "[o]ne who has filed a proof of claim is considered a party in interest unless the proof of claim is withdrawn or disallowed." *In re Xenon Anesthesia of Tex., P.L.L.C.*, 698 F. App'x 793, 794 (5th Cir. 2017). Though No Rust objects to Green Tech's proof of claim, it has neither been withdrawn nor disallowed. By contrast, the movant in *E.S. Bankest* never filed a proof of claim and asserted no interest in property of the estate. *See E.S. Bankest*, 321 B.R. at 596–97. No Rust has not provided, nor can the Court find, any case law concluding that a debtor's mere objection to a proof of claim eliminates the claimant's standing; the Court sees no support for such a conclusion here. *See, e.g.*, *In re Marshall*, 298 B.R. 670 (Bankr. C.D. Cal. 2003) (explaining that "[a] scheduled creditor who has failed to file a proof of claim remains a 'party in interest' with standing" under § 1112(b)).

---

[46] (Doc. 175 at 7–8.)

Further, Green Tech is a "creditor" and, therefore, a "party in interest" as defined by § 1109. A "creditor" under the Bankruptcy Code includes any "entity that has a claim against the debtor that arose at the time of or before the order for relief concerning the debtor." 11 U.S.C. § 101(10)(A). The definition of "claim" under the Bankruptcy Code is similarly broad and includes any "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." 11 U.S.C. § 101(5)(A). Green Tech asserts a right to payment and therefore holds a "claim" against No Rust which arose before the Petition Date, making Green Tech a "creditor" of No Rust, and a "creditor" is a "party in interest" as defined by § 1109.

In addition, even if Green Tech loses the Property Dispute, it still has a claim because No Rust must then perform under the option. As such, regardless of whether No Rust succeeds in its objection to Green Tech's claim and prevails in the Property Dispute, Green Tech retains a sufficient financial stake in the outcome of these proceedings. *See SFD @ Hollywood, LLC*, 411 B.R. at 455; *E.S. Bankest*, 321 B.R. at 595.

Moreover, the basis for Green Tech's request for removal or conversion is based on Smith's and No Rust's alleged fraud, dishonesty, conflicts of interests, incompetence, and gross mismanagement. The Court is unaware of any case law which suggests a debtor can prevent a creditor who seeks to share in the assets of a bankruptcy estate from seeking to protect those assets where it believes some improper action by the debtor may threaten them. To the contrary, such a

determination would seemingly present a legal and public policy nightmare. For example, if Green Tech is correct that Raw's sale of 10 million shares of stock for $1.2 million, all of which is now in the hands of Smith personally, was a postpetition sale of undisclosed estate property without court approval, decisive action would need to be taken to ensure that value is preserved. The Court sees no legal or factual basis to conclude that parties claiming to be creditors of the estate cannot act to protect the estate merely because the debtor objects to their claim. Consequently, the Court finds and concludes that Green Tech is a party in interest and has standing to seek removal or conversion.

## II.    **Cause for Conversion or Removal**

Conversion of a Chapter 11 case and removal of a debtor as debtor in possession may only be "for cause."[47] *See* 11 U.S.C. §§ 1112(b)(1) & 1185(a). Section 1112(b)(4) contains a list of non-exclusive potential causes for conversion and sufficient cause to remove a Subchapter V debtor as debtor in possession includes "fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor, either before or after the date of commencement of the case . . . or for failure to perform the obligations of the debtor under a plan confirmed under this subchapter."[48] In addition to the

---

[47] Even if the Court finds cause under § 1112(b)(1), it may not convert a case if it "finds and specifically identifies unusual circumstances establishing that converting . . . the case is not in the best interests of creditors and the estate, and the debtor or any other party in interest establishes" both that: (1) there is reasonable likelihood the debtor will timely confirm, or confirm within a reasonable period of time, a Chapter 11 plan, and (2) that the debtor's acts or omissions that support conversion can be both reasonably justified and cured within a reasonable period of time. 11 U.S.C. § 1112(b)(2). No party has specifically raised § 1112(b)(2) and the Court, on its own review of the record, sees no basis to apply § 1112(b)(2) to prevent conversion even if it identifies sufficient cause to convert.

[48] "Because § 1104(a) and §1185(a) use the same language, the court may rely on authority construing § 1104 in determining whether to remove a debtor in possession under §1185." *In re Neosho*

causes provided under § 1112(b)(4) and § 1185(a), bankruptcy courts have frequently identified other factors that support a finding of cause, including where "the debtor in possession has a conflict of interest in properly investigating and pursuing potential fraudulent transfers" and other claims of the estate. *In re Picacho Hills Utility Co., Inc.*, 518 B.R. 75, 82 (Bankr. D.N.M. 2014); *see also In re Ashley River Consulting, LLC*, No. 14-13406 (MG), 2015 WL 1540941, at *9 (Bankr. S.D.N.Y. Mar. 31, 2015). Here, the Court finds that substantial cause exists to convert the case or remove No Rust as the debtor in possession.

A.   <u>Smith commingled No Rust's assets with Smith's and the Family's assets in a manner that supports both conversion and removal.</u>

Though Smith sought to portray the Family as a group of related, but separate and distinct entities that operated independently, the evidence does not support his assertion. To the contrary, the Family appears to have been a group of commingled entities whose responsibilities, assets, and liabilities were constantly shuffled to fit Smith's needs or whims. This commingling resulted from incompetence or gross mismanagement of No Rust's affairs at best, and fraud or dishonesty at worst, but most damningly created an incurable conflict between the interests of Smith and those of the estate. Accordingly, conversion or removal of No Rust as debtor in possession is required.

Smith's bookkeeper served as the bookkeeper for the entire Family and Smith would simply rely on her and other financial professionals, such as his accountant, to

---

*Concrete Prod. Co.*, 2021 WL 1821444 (Bankr. W.D. Mo. May 6, 2021) (citing *In re Peak Serum, Inc.*, 623 B.R. 609, 614 n.1 (Bankr. D. Colo. 2020)).

sort out any confusion that might arise; Smith even used the same corporate emblem on the checks for the entire Family. Smith himself ultimately testified that the Family failed to maintain corporate formalities largely because the Family included all closely held companies that he personally controlled, he lacked clerical help to separate the Family's assets and liabilities, and "things began to get mixed up" once he "began to spend huge amounts of legal fees."[49]

This failure to maintain separate books and records amongst the various entities ultimately caused the commingling of many assets. This was perhaps best illustrated by Smith's testimony regarding how he identified the assets to include in the Schedules. According to Smith, he simply walked around the Property, which houses not just the Family but other entities not owned by Smith, and just picked assets to include in the Schedules.[50] It is, therefore, difficult—if not impossible—to discern with reasonable certainty what assets in the Property actually belong to No Rust.

Smith also commingled No Rust's assets with the assets of other Family members' through his unusual and improper practice of listing the formal name of one entity as the d/b/a or fictitious name of another.[51] He listed "No Rust Rebar, Inc." as RMC's fictitious name and as a d/b/a on its bank account, and "Raw, LLC" as a fictitious name of No Rust and RMC.

---

[49] (Docs. 130-20; 130-21; 131-6; 134-20; 160 at 16:18–17:1, 54:23–55:12, 87:25–93:5, 123:23–125:1, 128:21–133:11, 193:25–194:20, 207:7–209:10).

[50] (Doc. 188 at 210:8–25).

[51] *See* Fla. Stat. § 865.09(14).

Smith testified that he used No Rust's formal corporate name as a fictitious name and d/b/a of RMC so he could deposit checks made out to No Rust into RMC's account. In short, Smith testified that he created this structure specifically so he could, in his sole discretion, quickly and conveniently commingle assets in No Rust's name with those in RMC's name. Of course, Smith contends that he only deposited No Rust's checks into RMC's accounts where appropriate. Though the Court does not find that Smith necessarily intentionally committed fraud through this practice, Smith's mere statement on the record that his actions were always appropriate, especially in the absence of any specifics or legitimate business justification for the scheme, is not sufficiently credible to eliminate the very real possibility that RMC's bank account contains recoverable property of the estate of unknown value.

Raw's postpetition sale of 10 million shares of stock for $1.2 million presents similar issues. Even though No Rust listed "Raw, LLC" as its fictitious name with the State of Florida and on the Petition, No Rust received nothing from the sale. This is concerning. The evidence shows that:

(1)    No Rust and Raw are owned and operated by Smith;

(2)    Both No Rust and Raw were parties to the PayMeOn Deal, which included several assets and interests of No Rust and no assets or interests of Raw;

(3)    The PayMeOn deal provided No Rust with no direct consideration, but provided Raw with 10 million shares of PayMeOn stock;

(4)    Raw has no bank account and its only business has ever been to hold the PayMeOn stock;

(5)    Prepetition, No Rust listed "Raw, LLC" as its fictitious name;

(6)     On its Petition, No Rust listed "Raw, LLC" as its fictitious name;

(7)     Postpetition, in April 2021, Raw sold the PayMeOn stock for $1.2 million as part of a settlement agreement resolving the litigation stemming from the PayMeOn Deal;

(8)     No Rust received nothing from the sale of the stock or as part of the settlement agreement; and

(9)     The funds from the sale were provided to Smith personally.

In response, No Rust argues there is nothing to see here because the sale of the stock resulted from a litigation settlement involving Raw and that No Rust was uninvolved in the litigation and lacks an interest in the stock or in the proceeds resulting from the stock's sale.[52] This argument is based purely on Smith's conclusory testimony. In short, No Rust's argument boils down to Smith's request to just trust him and let him keep the money. That is simply insufficient and not credible. The Court, therefore, still has significant concerns regarding whether the settlement constitutes a postpetition sale of undisclosed property of the estate without court approval.

Smith commingled No Rust's assets with those of the Family and possibly himself, regularly transferred assets between No Rust and other Family members at his sole discretion and failed to maintain sufficient records showing the nature of those transfers and transactions. Other courts have found similar patterns "of intermingling funds and of expedient transfers, and the absence of proper record keeping" to be sufficient evidence to conclude that the debtor's principal lacks sound business judgment and supports removal of the debtor as debtor in possession. *See In*

---

[52] (Doc. 175 at 12).

*re Rivermeadows Assoc., Ltd.*, 185 B.R. 615, 619 (Bankr. D. Wyo. 1995). Certainly, there is more than enough evidence available in the record here to arrive at a similar conclusion.

But this issue goes far beyond Smith's poor practices and goes to the heart of whether Smith can effectively and appropriately discharge his duty to the estate and its creditors. At best, Smith's unusual business practices constitute prepetition incompetence and gross mismanagement of the affairs of No Rust. *See* 11 U.S.C. § 1185(a). At worst, those practices commingled No Rust's assets in a manner that has caused substantial loss to the estate for which there is little reasonable likelihood of recovery unless action is taken to pursue the funds. *See* 11 U.S.C. §§ 1112(b)(4)(A)–(B), & 1185(a); *Ashley River*, 2015 WL 1540941, at *9; *In re Harrell*, No. 12-30112, 2013 WL 1403484, at *1–2 (Bankr. S.D. Ga. Mar. 27, 2013).

These circumstances demand an investigation into whether the estate has an interest in any funds in RMC's bank account, in the PayMeOn stock (or the proceeds from its sale), or in any other assets of the other Family members. But only a trustee or the debtor in possession would seemingly have the authority to investigate and prosecute these issues. *See* 11 U.S.C. §§ 544, 548, & 549; *In re Pacific Gas & Elec. Co.*, 281 B.R. 1, 13 (Bankr. N.D. Cal. 2002). The Subchapter V trustee does not have this power and Smith, given his testimony, lacks the inclination.[53] *See* 11 U.S.C. § 1183(b). Left in control, Smith, as the principal of No Rust, would have to investigate and, if necessary, sue himself and his own entities. Clearly, this is an incurable conflict of

---

[53] Section 1183 provides the Subchapter V trustee with powers far more limited than those of other trustees. *See* 11 U.S.C. §§ 704(a) & 1106(a).

interest. "Where the debtor in possession has a conflict of interest in properly investigating and pursuing potential fraudulent transfers" or other claims that may benefit the estate, conversion is appropriate. *Picacho Hills Utility Co.*, 518 B.R. at 82 (cleaned up); *In re Ancona*, No. 14-10532 (MKV), 2016 WL 7868696, at *9–10 (Bankr. S.D.N.Y. Nov. 30, 2016); *In re Sundale, Ltd.*, 400 B.R. 890, 900 (Bankr. S.D. Fla. 2009). Accordingly, the Court concludes Smith's conflict constitutes sufficient "cause" for conversion or removal.

        B.    <u>The Plan justifies conversion.</u>

No Rust is presently not operating. This is, at least in part, Smith's choice as he decided it was in No Rust's best interest to remain on the Property, which lacks power, instead of finding a new location. This leads the Court to have substantial concern over the prospects of No Rust's reorganization and the feasibility of complying with a Subchapter V plan.

Under § 1112(b)(4)(J), the "failure to file a disclosure statement, or to file or confirm a plan, within the time fixed by this title or by order of the court" constitutes cause for conversion. Other courts have explained that causes exists under § 1112(b)(4)(J) where the debtor's plan is materially incomplete or otherwise insufficient. *See, e.g.*, *See In re Babayoff*, 445 B.R. 64, 78 (Bankr. E.D.N.Y. 2011). "[W]here . . . the plan contains inaccuracies and vague areas, as well as misstatements and deficiencies, conversion is warranted." *Id.* (cleaned up). Here, the Plan is materially incomplete and insufficient.

A confirmable plan must be feasible and provide "adequate means for the plan's implementation." *See* 11 U.S.C. §§ 1123(a)(5) & 1129(a)(1). To satisfy this

requirement, a plan must—at a minimum—offer reasonable assurances of success.
*See In re Haas*, 1362 F.3d 1087, 1090 (11th Cir. 1998); *In re Midland Plaza Assocs.*, 247 B.R. 877, 885 (Bankr. S.D. Fla. 2000). Here, the only means provided for the Plan's implementation require that No Rust prevail in the Property Dispute.

The Court has previously explained precisely what No Rust must accomplish to win the Property Dispute:

> No Rust seeks specific performance under the alleged Option. To win a suit for specific performance, "the plaintiff must do more than merely prove his case by a preponderance of the evidence ... he must prove the contract as alleged in his complaint by competent and satisfactory proof which must be clear, definite and certain." *Miller v. Murray*, 68 So. 2d 594, 596 (Fla. 1953) (emphasis added); *see, e.g.*, *Lupetto, Inc. v. South Bay Dev. Grp., LLC*, 302 So. 3d 1061, 1063 (Fla. 3d DCA 2020).
>
> Under Florida's Statute of Frauds, certain types of contracts – including contracts for the sale of land, contracts for leases that exceed one year, and contracts that will not be performed within one year – are only enforceable if they are in writing and signed by the party against whom relief is sought. Fla. Stat. § 725.01; *see Avery v. Marine Bank & Trust Co.*, 216 So. 2d 251, 252 (Fla. 2d DCA 1968) ("It is axiomatic that, under the Statute of Frauds, ... a mere oral contract for sale of lands is not enforceable in Florida."). Here, the parties agree there is no written contract signed by Green Tech providing No Rust with the Option. Normally, that would end the inquiry, but No Rust argues that the facts of this case fall under the "partial performance" exception to the Statute of Frauds. To take a contract out of the Statute of Frauds under the partial performance exception, the party seeking enforcement of the oral contract must establish: (1) that an oral contract for sale was made; (2) payment of all or part of the consideration, whether it be in money or services; (3) possession by the party seeking enforcement; and (4) the making of valuable and permanent improvements upon the land with the consent of the owner, or, in the absence of improvements, the proof of such facts as would make the transaction a fraud upon the purchaser if it were not enforced. *Miller*, 68 So. 2d at 596.
>
> If No Rust establishes the existence of a valid and enforceable oral contract including the Option, it will then have to show that it is entitled to specific performance by proving that it strictly complied with the applicable provisions of the contract and was ready, willing, and able to

perform under the contract at the time it exercised the Option. *See, e.g.*, *Shapiro v. Jacobs*, 948 So. 2d 880, 882 (Fla. 3d DCA 2007).

So, to prevail, No Rust must prove:

(1)    No Rust and Green Tech made an oral contract providing No Rust the option to purchase the Property;

(2)    No Rust provided at least part of the consideration under the contract;

(3)    No Rust possessed the Property;

(4)    No Rust made valuable and permanent improvements upon the land with the consent of Green Tech or, alternatively, facts that would make the transaction a fraud upon No Rust if it were not enforced; and

(5)    No Rust complied with all applicable terms of the contract and was ready, willing, and able to exercise its rights and perform the contract at the time it exercised its rights.

*No Rust*, 2021 WL 4314221, at *3–4.

This is an undeniably high burden for No Rust to satisfy, and it is certainly far from a given that it will. Of course, the Court believes No Rust *may* succeed, that is why the Court denied Green Tech's request for summary judgment, but that does not mean No Rust's success is reasonably likely. No Rust's Plan depends on victory in the Property Dispute, but because No Rust's chances of prevailing in the Property Dispute are not reasonably likely, the Plan is not feasible and fails to provide adequate means for its implementation.

More fundamentally, however, the Plan lacks any explanation of precisely how No Rust will ramp up, particularly because No Rust has not really conducted much business. No Rust offers no estimate of the amount of capital investment required for it to begin operating, a business plan, projections showing profitability allowing it to

pay its creditors, or substantive information regarding the availability of the capital other than a vague promise by Smith to fund the Plan.[54] No Rust provides woefully insufficient information required by its Subchapter V plan. *See* 11 U.S.C. § 1190(1)(C).

The Court finds that the Plan, as presented, is not feasible, fails to provide adequate means for its implementation, and does not include information that is required in every Subchapter V Plan. As such, the Plan's material insufficiency constitutes cause for conversion.

C.    The Schedules justify conversion.

The Schedules contains several clear deficiencies and possible areas of concern. The clearest deficiency in the Schedules is No Rust's failure to schedule a nearly $492,000 debt owed to it by RMC for which No Rust provides no explanation.[55] It is notable that No Rust neglected to account for a debt owed to it by a company owned and controlled by Smith. The failure to include the debt in the Schedules, without explanation, constitutes an unexcused failure to disclose material information in the Schedules. Such a failure, whether willful or reckless, supports conversion. *See* 11 U.S.C. § 1112(b)(4)(F); *In re Korn*, 523 B.R. 453, 467 (Bankr. E.D. Pa. 2014) (holding that, while the bankruptcy court could infer that the debtor's "glaring omissions" from his schedules were deliberate, a mere finding of recklessness was sufficient cause for conversion (citing *Bullock v. BankChampaign, N.A.*, 569 U.S. 267 (2013)).

---

[54] Ironically, this suggests Smith may use the money earned from the postpetition sale of the PayMeOn stock to fund the Plan.

[55] (Docs. 131-25; 160 at 199:16–203:9).

In addition, there are several potential additional discrepancies and areas of concern that are worthy of investigation, namely whether No Rust should have scheduled the RMC checking account, accurately identified its assets, and properly scheduled a debt owed personally to Smith's sister from before No Rust was even founded.[56] Though the Court does not find, at this time, that those issues are necessarily cause for conversion or removal on their own, the Court does find that those issues are worthy of further investigation. Based on Smith's conflict of interest in investigating these matters, removal or conversion is necessary.

    D.    <u>The Monthly Operating Reports justify conversion.</u>

The Subchapter V Trustee testified and included in her final brief that (1) as of December 21, 2021, No Rust had not provided the Subchapter V Trustee with its 2019 or 2020 tax returns, (2) few documents were made available to the Subchapter V Trustee and the U.S. Trustee, (3) the Subchapter V Trustee is of the opinion that No Rust failed to satisfy its obligation to timely file tax returns and other required government filings, and (4) No Rust provided insufficient monthly operating reports. The Court previously found that the monthly operating reports were insufficient and ordered their amendment to include "all required information." Despite No Rust's timely amendments prior to the evidentiary hearing, the Subchapter V Trustee still testified that she had not been presented with "fulsome monthly operating reports."[57] This constitutes cause for conversion.

---

[56] (Docs. 19 at 16; 131-9; 160 at 144:10–155:19, 191:21–193:4; 170 at 25:4; 188 at 210:8–25).
[57] (Docs. 77; 80–85; 160 at 17:8–21:25, 25:9–13; 28:17–30:14, 33:7–14; 180).

First, the "unexcused failure to satisfy timely any filing or reporting requirement established by this title or by any rule applicable to a case under this chapter" is cause for conversion. *See* 11 U.S.C. § 1112(b)(4)(F). No Rust's failure to timely provide the Subchapter V Trustee and U.S. Trustee with all of the required filings, reports, and information—particularly "fulsome monthly operating reports"— was unexcused and supports a finding of cause. *See, e.g.*, *In re Landmark Atl. Hess Fam, LLC*, 448 B.R. 707, 716–17 (Bankr. D. Md. 2011) (holding that the U.S. Trustee's opinion that the debtor's monthly operating report "contain[ed] deficiencies" was sufficient to find cause under § 1112(b)(4)(F)).

Second, the "failure to comply with an order of the court" is cause for conversion. 11 U.S.C. § 1112(b)(4)(E). The failure to comply with a court order need not be willful or the product of bad faith. *See Babayoff*, 445 B.R. at 80 (holding that a debtor's failure to timely file monthly operating reports in violation of a court order, even without a finding of willfulness or bad faith was sufficient to constitute cause under § 1112(b)(4)(E)). Here, the Court ordered No Rust to amend its deficient monthly operating reports to include all required information. Though No Rust timely amended, the Subchapter V Trustee continues to testify that she has yet to be presented with "fulsome monthly operating reports." The amended reports, therefore, are still deficient. The Court does not question No Rust's or its counsel's desire to provide as complete a picture as possible in the monthly operating reports, but the fact remains that those who have been tasked with understanding and ascertaining No Rust's financial position have been unable to do so through the monthly operating

reports, even as amended. As such, despite No Rust's attempt to amend its reports, the insufficiency of the amended reports still constitutes cause for conversion under § 1112(b)(4)(E).

Despite what may or may not be No Rust's best efforts, its failure to maintain adequate books and records has seemingly prevented it from providing all the required information necessary to apprise the creditors, Subchapter V Trustee, U.S. Trustee, and the Court with all the necessary information to understand its financial condition. This inability is cause for conversion under §§ 1112(b)(4)(E) and (F).

E.    <u>Smith's prepetition failure to get a signed and written contract that includes an option to purchase the Property constitutes incompetence or gross mismanagement.</u>

Based on the evidence provided, the Property Dispute can only have arisen in one of two ways. Either (1) Smith is lying that Green Tech granted No Rust an option in consideration for the assignment to purchase the Property, or (2) Smith failed to have the agreement signed in writing. For purposes of this analysis, the Court will assume that No Rust and Smith have been truthful in their version of events and No Rust believes Green Tech orally promised an option to buy the Property from Green Tech.

The failure to document the purported option by a signed, written contract with Green Tech is Smith's fault and singlehandedly thwarted No Rust's business prospects before they even began. Now, as Smith and No Rust acknowledge, they must win the Property Dispute to have any hope at salvaging No Rust. Though the Court denied summary judgment in favor of both parties in the Property Dispute, No Rust or Smith must meet an extremely high burden to succeed in that case.

Regardless of whether No Rust may ultimately prevail in the Property dispute, the only reason it is in this position in the first place falls squarely on Smith's shoulders. As a result of this incompetence and gross mismanagement, No Rust is unlikely to be able to successfully reorganize. *See* 11 U.S.C. § 1112(b)(2)(A).

### III.    <u>Conversion is in the best interests of the estate.</u>

The Court finds both that (1) there is sufficient cause to remove No Rust as the debtor in possession or to convert the case to a Chapter 7, and (2) the requirements of § 1112(b)(2), which would prevent conversion even in the face of cause, have not been satisfied. Therefore, the Court must either remove Smith or convert the case. *See* 11 U.S.C. §§ 1112(b)(1) & 1185(a) (both stating that "the court *shall*" remove the debtor or convert the case). Here, the most appropriate conclusion is conversion.

As the Subchapter V Trustee articulated in her final brief, No Rust is an entity that, at best, holds an interest in a single piece of real estate, lacks any real production facility, and has failed to provide a "viable solution" to becoming an operational business.[58] The statements of Smith and what little information is provided in the monthly operating reports seemingly support this conclusion. There appears to be no business to reorganize and, consequently, no reason to place the Subchapter V Trustee in control of No Rust's assets. If the Court removed No Rust as the debtor in possession, in all likelihood, the Subchapter V Trustee would have to liquidate the assets of the estate and pursue any claims that the trustee might believe

---

[58] *See* (Doc. 180 at 2).

are in the interest of the estate. This is best accomplished through a Chapter 7. Therefore, conversion is in the best interest of creditors and the estate.

Accordingly, the Court **ORDERS**:

1. The *Motion to Convert* (Doc. 116) is **GRANTED**.

    a.    This case is **CONVERTED** to a Chapter 7 case.

    b.    If applicable, the Debtor shall remit to the clerk of court the $15.00 trustee surcharge fee prescribed by the Judicial Conference of the United States (if not previously paid by the debtor).

    c.    No Rust shall:

        i.    Turnover to the Chapter 7 trustee all records and property of the estate under its custody and control as required by Fed. R. Bankr. P. 1019(4);

        ii.    Within 30 days of the date of this Order, file an accounting of all receipts and distributions made. A copy of this report must be served on the U.S. Trustee; and

        iii.    Within 14 days of the date of this Order, file a schedule of unpaid debts incurred after the commencement of the Chapter 11 case as required by Fed. R. Bankr. P. 1019(5) and a supplement matrix and certification in the format required by Local Rule 1019-1(B). No Rust or No Rust's counsel is required to provide notice to those creditors

under Local Rule 1019-1(B). Failure to comply may also result in sanctions being imposed by the Court. Debts not listed or noticed will not be discharged. A copy of this schedule shall be served on the Chapter 7 trustee.

iv. Within 14 days of the date of this Order, file the statements and schedules required by Fed. R. Bankr. P. 1019(1)(A) and 1007(c) and in accordance with Local Rule 1019-1(B).

d. Under Local Rule 2016-1(C)(2), the Debtor's attorney, any examiner or trustee appointed by the Court, or any other professional person employed under 11 U.S.C. §§ 327 or 1103 shall, within 90 days after the date of the post-conversion meeting, file an application for compensation of outstanding fees and expenses incurred during the Chapter 11 administration including an application justifying retention of any retainer received which has not been approved by a prior award. Any retainers received which are not approved will be subject to turnover to the Chapter 7 trustee. Counsel for No Rust shall notify all such professionals of this deadline by serving them with a copy of this Order.

e. No Rust shall provide notice to affected parties of the deadline set pursuant to Local Rule 1019-1(J)(1) for filing by a

nongovernmental unit a request for payment of an administrative

expense.

    f.    Failure of No Rust to comply with the provisions of this Order my

result in dismissal of this case without further hearing or notice.

2.  The *Motion to Remove* (Doc. 70) is **DENIED AS MOOT**.

# # #

*Copes to Stacy Bressler, Esq., who is directed to serve this Order on all interested parties.*