UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION

In re:                                                          Case No. 21-12188-PDR
                                                                Chapter 7
**NO RUST REBAR, INC.**

_____Debtor_____/

## MOTION TO SUBSTANTIVELY CONSOLIDATE RAW MATERIALS CORP., RAW ENERGY MATERIALS, CORP., GLOBAL ENERGY SCIENCES, LLC, AND RAW, LLC INTO THIS ESTATE

Sonya S. Slott, as Chapter 7 Trustee (the "**Trustee**") for the above- captioned bankruptcy estate (the "**Estate**"), by and through undersigned counsel, pursuant to 11 U.S.C. § 105(a), hereby files this Motion to Substantively Consolidate Raw Materials Corp. ("**RMC**"), Raw Energy Materials, Corp. ("**REM**"), Global Energy Sciences, LLC ("**GES**"), and Raw, LLC ("**RAW**") into this Estate (the "**Motion**") and states in support as follows:

### INTRODUCTION

Through this Motion, the Trustee seeks entry of an order (i) substantively consolidating RMC, REM, GES, and RAW (collectively, the "**Consolidated Debtors**" or "**Family Entities**")" and their assets and liabilities into this Estate and (ii) preserving any avoidance actions held by the Consolidated Debtors.

### BACKGROUND

1.      This case was commenced with the filing of a voluntary Chapter 11 Subchapter V bankruptcy petition by the debtor No Rust Rebar, Inc. ("**Debtor**" or "**No Rust**") on March 5, 2021 ("**Petition Date**") [ECF #1], commencing the above-captioned bankruptcy case (the "**Bankruptcy Case**").

2.     On August 5, 2021, creditor Green Tech Development, LLC ("**Green Tech**") filed its Motion for Removal of Debtor as Debtor in Possession [ECF #70] and, on November 21, 2021, filed its related Motion to Convert Chapter 11 Case to Chapter 7 [ECF #116] (collectively, "**Green Tech Motions**").

3.     After four days of evidentiary hearings in December 2021 and January 2022 ("**Evidentiary Hearings**"), the case was converted to a Chapter 7 proceeding [ECF #193] ("**Conversion Order**") on May 23, 2022, and Sonya Salkin Slott was appointed as Chapter 7 trustee of the Debtor's bankruptcy estate ("**Estate**") [ECF #195] on May 24, 2022. The Conversion Order was not appealed and is now a final order.

4.     In its 34-page Conversion Order, the Court issued a memorandum opinion which makes extensive findings of facts and conclusions of law resulting from the evidentiary hearing on the Green Tech Motions.  The Trustee adopts the entirety of the Court's extensive findings of fact and conclusions of law in this Motion, and **all parties in interest should review the Conversion Order in its entirety for complete background**, but for clarity's sake the Trustee will cite to specific sections of the Conversion Order, occasionally condensed, in support of the relief sought in this Motion (for page references only, the Conversion Order is abbreviated "CO").

## RELEVANT FINDINGS OF FACT

5.     In January 2015, No Rust was founded as a closely-held corporation by its principal, Don Smith ("**Smith**"). Smith was interested in operating No Rust in a foreclosed industrial facility located at 170 SE 13th Street Pompano Beach, Florida, that contained office space, meeting rooms, and an industrial facility (the "**Property**"). The Property required significant repairs and maintenance. Nevertheless, in July 2015, No Rust contracted to purchase

the Property for $450,000 and paid a non-refundable $50,000 deposit that allowed it to occupy the premises and begin maintenance and repairs immediately. *CO pp.2-3.*

6.    However, lacking sufficient funds to complete this transaction, Smith instead persuaded an acquaintance to found Green Tech, to which No Rust agreed to assign its right to purchase the Property. In January 2016, Green Tech bought the Property and No Rust remained in possession there. *CO pp. 3-4.*

7.    In May 2016, No Rust executed, but never recorded, a $400,000 mechanics lien against the Property in favor of another company Smith had recently created, Raw Materials Corp. ("**RMC**"). RMC was created by Smith in September 2015 to provide fiber and resin packages to his entities and also operated out of the Property. When pressed about why RMC received the mechanics lien, Smith acknowledged it was "protection" for his entities to make the Property "less enticing" to Green Tech. Shortly thereafter, Smith listed "No Rust Rebar, Inc." both as a fictitious name of RMC and as a d/b/a on RMC's bank account. Smith testified he did this so he could transfer checks made payable to No Rust to RMC when he, in his discretion, believed doing so was appropriate. *CO pp. 4-5.*

8.    In December 2016, Smith founded Raw, LLC ("**Raw**"), which served as a holding company. Then, in January 2017, Smith reinstated an older entity, Global Energy Sciences, LLC ("**GES**"), to hold his intellectual property, including the trademark and brand licenses associated with his basalt rebar product. However, it appears No Rust paid the bills for at least some of GES's intellectual property and, at least once, transferred a patent to GES for no consideration. No Rust is supposedly obligated to pay GES $200/day ($73,000 annually) for a license to produce basalt rebar, though Smith testified that payment has not been required recently given No Rust's financial situation. *CO p. 5.*

9.      In February 2017, Smith used various entities to complete a deal with PayMeOn, Inc. ("**PayMeOn**"), an arms-length publicly traded company interested in the sale of Smith's basalt rebar (the "**PayMeOn Deal**"). Under the agreement, PayMeOn received an exclusive license to sell basalt rebar in Florida and the Caribbean. No Rust provided two machines, basalt fibers, and finished inventory to help close the deal, but in return received no consideration. RMC, however, received $2.4 million in cash and Raw received 10 million shares in PayMeOn. In short, in exchange for No Rust's assets and No Rust losing its right to sell basalt rebar in Florida and the Caribbean, RMC received millions of dollars, Raw received millions of shares in a publicly traded company, and No Rust received nothing. Raw was also supposed to receive a consulting fee, but the testimony at the Evidentiary Hearings suggests that Raw received no cash and never held any assets other than the shares of PayMeOn stock. *CO pp. 5-6.*

10.     In September 2020, RMC registered "Raw, LLC" as a fictitious name. No explanation was been provided for this action. On March 5, 2021, No Rust registered "Raw, LLC" as a fictitious name. No explanation was provided for this action either. *CO p. 7.*

11.     RMC's checking account is not listed in the Schedules even though "No Rust Rebar, Inc." is listed as a d/b/a on the account and the account was open on the Petition Date. According to Smith, the failure to include the account was not a mistake because, despite being listed as a d/b/a on the account, No Rust has no interest in the account. *Id.*

12.     The Debtor's 2020 tax returns provide that No Rust is due nearly $492,000 from RMC, but No Rust did not list that accounts receivable as an asset in the Schedules. When pressed, Smith was unable to provide a sufficient explanation for what the debt due to No Rust is for or why it was not included in the Schedules but did acknowledge it should have been. *Id.*

13.     The Debtor's 2020 tax returns showed that No Rust had no inventory, but No Rust scheduled some inventory on the Schedules. Smith explained that the inventory was not listed based on any consideration of corporate documentation but was rather determined by walking around the building (which holds other corporate entities' assets) and identifying certain pieces of inventory to include. *CO pp. 7-8.*

14.     Post-petition, on April 14, 2021, as part of a litigation settlement agreement related to the PayMeOn Deal, Raw agreed to sell its 10 million shares in PayMeOn to Basanite, Inc. for $1.2 million. The deal was not disclosed, and no Court approval was sought for the transaction. Because Raw does not have its own bank account, the funds were remitted to Smith. Smith contends that, even though Raw is No Rust's fictitious name, the settlement was unrelated to No Rust and there was not a need to disclose the settlement or seek court approval for it. *CO p. 9.*

15.     Smith refers to his closely held entities as the "Family." The commingling of Family assets and affairs is plain. Smith routinely transferred money amongst the Family at his sole discretion, his bookkeeper served as the bookkeeper for the whole Family, and whenever assets appeared commingled amongst the Family, Smith would simply rely on his financial professionals to sort out any issues or confusion that might arise. Smith also used the same emblem on every Family member's checks. Smith explained that the Family failed to maintain corporate formalities largely because the Family included closely held companies that he personally controlled, he lacked clerical help to separate the Family's assets and liabilities, and "things began to get mixed up" once he "began to spend huge amounts of legal fees." *CO pp. 10-11.*

## RELEVANT CONCLUSIONS OF LAW

16.     In the voluminous Conclusions of Law contained in the Conversion Order, the Court has a section entitled "***Smith commingled No Rust's assets with Smith's and the Family's***

***assets in a manner that supports both conversion and removal.***" *CO pp. 19-23.* These same Conclusions of Law fully and unambiguously support the relief sought by the Trustee through this Motion, and should not be abbreviated. For the clarity of the record regarding this Motion, they are reproduced here as stated, minus their supporting footnotes (which are, of course, available in the Conversion Order):

> Though Smith sought to portray the Family as a group of related, but separate and distinct entities that operated independently, the evidence does not support his assertion. To the contrary, the Family appears to have been a group of commingled entities whose responsibilities, assets, and liabilities were constantly shuffled to fit Smith's needs or whims. This commingling resulted from incompetence or gross mismanagement of No Rust's affairs at best, and fraud or dishonesty at worst, but most damningly created an incurable conflict between the interests of Smith and those of the estate. Accordingly, conversion or removal of No Rust as debtor in possession is required.

> Smith's bookkeeper served as the bookkeeper for the entire Family and Smith would simply rely on her and other financial professionals, such as his accountant, to sort out any confusion that might arise; Smith even used the same corporate emblem on the checks for the entire Family. Smith himself ultimately testified that the Family failed to maintain corporate formalities largely because the Family included all closely held companies that he personally controlled, he lacked clerical help to separate the Family's assets and liabilities, and "things began to get mixed up" once he "began to spend huge amounts of legal fees."

> This failure to maintain separate books and records amongst the various entities ultimately caused the commingling of many assets. This was perhaps best illustrated by Smith's testimony regarding how he identified the assets to include in the Schedules. According to Smith, he simply walked around the Property, which houses not just the Family but other entities not owned by Smith, and just picked assets to include in the Schedules. It is, therefore, difficult—if not impossible—to discern with reasonable certainty what assets in the Property actually belong to No Rust.

> Smith also commingled No Rust's assets with the assets of other Family members through his unusual and improper practice of listing the formal name of one entity as the d/b/a or fictitious name of another. He listed "No Rust Rebar, Inc." as RMC's fictitious name and as a d/b/a on its bank account, and "Raw, LLC" as a fictitious name of No Rust and RMC.

> Smith testified that he used No Rust's formal corporate name as a fictitious name and d/b/a of RMC so he could deposit checks made out to No Rust into RMC's

account. In short, Smith testified that he created this structure specifically so he could, in his sole discretion, quickly and conveniently commingle assets in No Rust's name with those in RMC's name. Of course, Smith contends that he only deposited No Rust's checks into RMC's accounts where appropriate. Though the Court does not find that Smith necessarily intentionally committed fraud through this practice, Smith's mere statement on the record that his actions were always appropriate, especially in the absence of any specifics or legitimate business justification for the scheme, is not sufficiently credible to eliminate the very real possibility that RMC's bank account contains recoverable property of the estate of unknown value.

Raw's postpetition sale of 10 million shares of stock for $1.2 million presents similar issues. Even though No Rust listed "Raw, LLC" as its fictitious name with the State of Florida and on the Petition, No Rust received nothing from the sale. This is concerning. The evidence shows that:

> (1) No Rust and Raw are owned and operated by Smith;
>
> (2) Both No Rust and Raw were parties to the PayMeOn Deal, which included several assets and interests of No Rust and no assets or interests of Raw;
>
> (3) The PayMeOn deal provided No Rust with no direct consideration, but provided Raw with 10 million shares of PayMeOn stock;
>
> (4) Raw has no bank account and its only business has ever been to hold the PayMeOn stock;
>
> (5) Prepetition, No Rust listed "Raw, LLC" as its fictitious name;
>
> (6) On its Petition, No Rust listed "Raw, LLC" as its fictitious name;
>
> (7) Postpetition, in April 2021, Raw sold the PayMeOn stock for $1.2 million as part of a settlement agreement resolving the litigation stemming from the PayMeOn Deal;
>
> (8) No Rust received nothing from the sale of the stock or as part of the settlement agreement; and
>
> (9) The funds from the sale were provided to Smith personally.

Smith commingled No Rust's assets with those of the Family and possibly himself, regularly transferred assets between No Rust and other Family members at his sole discretion and failed to maintain sufficient records showing the nature of those transfers and transactions. Other courts have found similar patterns "of intermingling funds and of expedient transfers, and the absence of proper record

keeping" to be sufficient evidence to conclude that the debtor's principal lacks sound business judgment and supports removal of the debtor as debtor in possession. *See In re Rivermeadows Assoc., Ltd.*, 185 B.R. 615, 619 (Bankr. D. Wyo. 1995). Certainly, there is more than enough evidence available in the record here to arrive at a similar conclusion.

## ANALYSIS

### A.    Substantive Consolidation Standard

17.    The Eleventh Circuit clearly articulated the standards for substantive consolidation in *Eastgroup Properties v. Southern Motel Association Ltd.,* 935 F.2d 245 (11th Cir. 1991). *See also Reider v. Reider* (In re Reider), 31 F. 3d 1102 (11th Cir. 1994). The "basic criterion by which to evaluate a proposed substantive consolidation is whether 'the economic prejudice of continued debtor separateness' outweighs 'the economic prejudice of consolidation.'" *Eastgroup,* 935 F.2d at 249 (quoting *In re Snider Bros., Inc*., 18 B.R. 230, 234 (Bankr.D.Mass.1982)). The "proponent of substantive consolidation must show that (1) there is substantial identity between the entities to be consolidated; and (2) consolidation is necessary to avoid some harm or to realize some benefit." *Eastgroup,* 935 F.2d at 249 (citations omitted). This showing constitutes a prima facie case for substantive consolidation and "the burden shifts to an objecting creditor to show that (1) it has relied on the separate credit of one of the entities to be consolidated; and (2) it will be prejudiced by substantive consolidation." *Eastgroup*, 935 F.2d at 249 (citing *Drabkin v. Midland–Ross Corp.* (*In re Auto-train Corp*.), 810 F.2d 270, 276 (D.C.Cir.1987); *Matter of Lewellyn*, 26 B.R. at 252 ("once the proponent of consolidation makes out a prima facie case the burden shifts to the objector to show there was sole reliance on the credit of one entity"); *In re Snider Bros*., 18 B.R. at 238 (that objecting creditor "has looked solely to the credit of its debtor" and "is certain to suffer more than minimal harm as a result of consolidation" constitutes defense to substantive consolidation)). However, even if an objecting creditor makes this showing, substantive consolidation may still be

ordered if the "demonstrated benefits of consolidation 'heavily' outweigh the harm." *Eastgroup,* 935 F.2d at 249 (citing *Drabkin,* 810 F.2d at 276).

18.     "In evaluating whether the party seeking consolidation has met his initial burden, the courts often look to seven factors outlined by the bankruptcy court in *Vecco*: (1) The degree of difficulty in segregating and ascertaining individual assets and liability; (2) The presence or absence of consolidated financial statements; (3) The profitability of consolidation at a single physical location; (4) The commingling of assets and business functions; (5) The unity of interests and ownership between the various corporate entities; (6) The existence of parent and intercorporate guarantees on loans; and (7) The transfer of assets without formal observance of corporate formalities." *In re S & G Fin. Services of S. Florida, Inc.*, 451 B.R. 573, 584 (Bankr. S.D. Fla. 2011) (citing *In re Vecco Const. Indus., Inc.*, 4 B.R. 407, 410 (Bankr. E.D. Va. 1980))

19.     In conjunction with the *Vecco* factors, the *Eastgroup* court noted that the following additional factors could also be relevant in deciding whether to substantively consolidate entities: "(1) the parent owning the majority of the subsidiary's stock; (2) the entities having common officers or directors; (3) the subsidiary being grossly undercapitalized; (4) the subsidiary transacting business solely with the parent; and (5) both entities disregarding the legal requirements of the subsidiary as a separate organization." *Eastgroup*, 935 F.2d at 250 (citing *Pension Benefit Guar. Corp. v. Ouimet Corp.,* 711 F.2d 1085, 1093 (1st Cir.1983)).

20.     In providing for substantive consolidation, "[t]he court is afforded a good deal of discretion in constructing its order of substantive consolidation, and its appropriateness is determined by the court on a sui generis basis." *In re Delacorp.*, 179 B.R. 773, 777 (Bankr. S.D.N.Y. 1995) (internal citation omitted). Although generally a substantive consolidation eliminates inner-corporate liabilities of consolidated entities, "[t]he court retains the power to order

a less than complete consolidation, preserving avoidance claims by the formerly separate estates." Id. Thus, the Eighth and Ninth Circuits courts of appeal have held that a bankruptcy court may preserve avoidance actions as to transfers made to third parties by one entity for the benefit of a related entity notwithstanding a subsequent consolidation. *See First National Bank v. Gill*er (In re Giller), 962 F.2d 796, 799 (8th Cir. 1992).[1]

21.    The Trustee seeks within the order granting this motion and substantive consolidation a ruling, consisting with this case law, preserving all avoidance actions as to transfers made to third parties by one entity for the benefit of a related entity, notwithstanding the Court substantively consolidating Consolidated Debtors with the Estate.

**B. Substantial Identity Exists between the Debtor and Consolidated Debtors.**

22. In this matter, substantial identify exists between the Debtor and the proposed Consolidated Debtors. The below now undisputed facts highlight a great number of the *Vecco* factors, which overwhelming support substantive consolidation:

a. *Vecco* Factor 1 (difficulty in segregating/ascertaining assets and liabilities): "Smith commingled No Rust's assets with those of the Family and possibly himself, regularly transferred assets between No Rust and other Family members at his sole discretion and failed to maintain sufficient records showing the nature of those transfers and transactions." *CO p. 22.*

b. *Vecco* Factor 2 (presence or absence of consolidated financial statements): "Smith routinely transferred money amongst the Family at his sole discretion, his

---

[1] In *Giller,* for example, the court held that the bankruptcy court did not abuse its discretion when, in connection with its order allowing for substantive consolidation, preserved the trustee's ability to bring avoidance actions for transfers made by one debtor to a third party for the benefit of another debtor. *See also In re Bonham*, 299 F.3d 750 (9th Cir. 2000) (allowing trustee to preserve avoidance powers).

bookkeeper served as the bookkeeper for the whole Family, and whenever assets appeared commingled amongst the Family, Smith would simply rely on his financial professionals to sort out any issues or confusion that might arise. Smith also used the same emblem on every Family member's checks. Smith explained that the Family failed to maintain corporate formalities largely because the Family included closely held companies that he personally controlled, he lacked clerical help to separate the Family's assets and liabilities, and 'things began to get mixed up" once he "began to spend huge amounts of legal fees'." *CO p. 10-11.*

c. *Vecco* Factor 3 (profitability of consolidation at single physical location): not applicable in this case.

d. *Vecco* Factor 4 (commingling of assets and business functions): "This failure to maintain separate books and records amongst the various entities ultimately caused the commingling of many assets. This was perhaps best illustrated by Smith's testimony regarding how he identified the assets to include in the Schedules. According to Smith, he simply walked around the Property, which houses not just the Family but other entities not owned by Smith, and just picked assets to include in the Schedules. It is, therefore, difficult—if not impossible—to discern with reasonable certainty what assets in the Property actually belong to No Rust." *CO p. 20.*

e. *Vecco* Factor 5 (unity of interests and ownership between the various corporate entities): The Debtor and the Consolidated Debtors are dominated and controlled by Don Smith, exclusively.

f.  *Vecco* Factor 7 (transfers of assets without formal observance of corporate formalities): As stated more fully above, Smith transferred funds without the observance of any corporate formality. This was the rule, not the exception.

23. Looking at the additional *Eastgroup* factors, substantive consolidation is in the best interest of the Estate and creditors. The factors include:

a. *Eastgroup* Factor 2 (the entities having common officers and directors): As stated more fully above, Smith, and Smith alone, owned, controlled, and managed the affairs of the Debtor and the Consolidated Debtors.

b. *Eastgroup* Factor 5 (both entities disregard the legal requirements of the subsidiary as a separate organization): Smith disregarded the legal requirements of the Debtor and the Consolidated Debtors, fraudulently transferring such funds for his personal use. Smith, through his ownership and control of the Debtor and the Consolidated Debtors, did not treat the entities as separate.

24. Based on the above, a substantial identity exists between the Debtor and the Consolidated Debtors. As such, the Trustee requests that the Court substantively consolidate the Debtor and Consolidated Debtors.

**C. Substantive Consolidation Provides Benefits and Avoids Harm.**

25. Further, the benefits of substantive consolidation are significant from a case management perspective. A substantive consolidation will streamline liquidation of assets and distribution to creditors. Procedural efficiency will be realized in bringing this entity into this bankruptcy estate and all creditors will directly benefit from this efficiency in such a simplified process. Professional fees will also be greatly reduced and avoided.

26. To the extent some creditors have multiple duplicative claims against the Debtor and the Consolidated Debtors, all such creditors will be on "equal footing" with other creditors of the Debtor's estate and will be paid from a single pot. Substantive consolidation will likewise streamline litigation claims and reduce professionals' fees, avoiding multiple cases, motion practice, discovery requests, and case management issues with similar claimants and identical professionals.

27. Moreover, substantive consolidation avoids the need for the determination, filing and prosecution of inter-company claims, which would be expensive and time consuming. Substantive consolidation with the express preservation of avoidance actions that may be brought by each of the Consolidated Debtors presents a significant benefit for all creditors and avoids a harm that would otherwise result. Due to the amount of transfers that appear to have been made by the Debtor through Consolidated Debtors, the value of avoidance claims will likely be meaningfully enhanced by substantive consolidation.

**D. The Court Has the Authority to Substantively Consolidate Consolidated Debtors.**

28. Bankruptcy courts in the Southern District of Florida and elsewhere have ordered the substantive consolidation of a non-debtor with a bankruptcy debtor. See e.g., *In re Puig*, Case No. 07-14026-RAM (Bankr. S. D. Fla.) [D.E. 2139]; *In re Rollaguard Security, LLC., et al*., Case No. 14-38071-EPK (Bankr. S. D. Fla.) [D.E. 857] (granting motions for substantive consolidation of a non-debtor); *In re CLSF III IV, Inc., et al*., Case No. 12-30081-EPK (Bankr. S. D. Fla.) [D.E. 857] (granting motions for substantive consolidation of a non-debtor); *see also In re Alico Mining, Inc*., 278 B.R. 586 (Bankr. M.D. Fla. 2002); *Munford, Inc. v. TOC Retail, Inc*., (In re Munford, Inc.), 115 B.R. 390 (Bankr. N.D. Ga. 1990).

29. In *Alico Mining*, for example, the bankruptcy court, recognized substantive consolidation as an alternative means to bring a non-debtor's assets into a debtor's estate. 278 B.R. at 588-589. In support, it was argued by the creditor who filed the motion that both the debtor and non-debtor were controlled and dominated by the same individual and that individual determined what to do with the funds generated under an agreement for purchase of mining rights between the debtor and non-debtor. The bankruptcy court determined that it had the power to grant the requested relief under its general equitable powers. *See also In In re SK Foods, LLP*, 499 B.R. 809 (Bankr. E.D. Cal. 2013) (the same individual owned or controlled the various debtor and nondebtor entities, funds were regularly transferred between, among and diverted from those entities, the debtor and non-debtor entities did not deal with each other at arm's length, had inextricably intertwined finances and their business affairs were "hopelessly entangled").

**E. No Creditor Can Show (1) That It Relied Upon the Separate Credit of Any One of the Consolidated Debtors and also (2) That It Will Be Prejudiced by Substantive Consolidation**

30. As the Trustee can make a *prima facie* case for consolidation, any objecting creditor has the burden to show that "(1) it has relied on the separate credit of one of the entities to be consolidated; and (2) it will be prejudiced by substantive consolidation." *Eastgroup*, 935 F.2d at 249.

31. All debts of the Consolidated Debtors appears to be intra-company loans and therefore there does not appear a creditor that relied on the separate creditor of any of the entities. Even assuming that a creditor could meet the first prong of the *Eastgroup* test, the creditor would not likely demonstrate that it will be prejudiced or harmed by substantive consolidation. The only viable means to fairly, efficiently and, in a cost-effective manner, address issues respecting the

creditors of the Debtor's bankruptcy estate is to substantively consolidate the Consolidated Debtors. The only prejudice to creditors here would be to deny that relief.

**F. Notice to Creditors.**

32. The Trustee is providing notice of this Motion to all of the Debtor's creditors, all known creditors of Consolidated Debtors, and potential interested parties listed on the attached Exhibit "A".

## CONCLUSION

33. For the foregoing reasons, the Court should enter an Order (i) substantively consolidating the Debtor with the Consolidated Debtors retroactive to the Petition Date; and (ii) preserving any avoidance actions held by Consolidated Debtors.

34. The Trustee respectfully requests that the Court enter an order substantively consolidating the Family Entities with the Debtor effective as of the Debtor's Petition Date. This relief has been approved by numerous Courts. See In re CLSF III IV, Inc. et al., Case No. Case 12-30081-EPK [ECF Nos. 561, 643, 673]; see also In re Baker & Getty Fin. Servs., 974 F. 2d 712 (6th Cir. 1992); In re Auto-Train Corp., 810 F.2d 270 (D.C. Cir. 1987); In re Bonham, 229 F.3d 750 (9th Cir. 2000); In re S&G Fin. Servs., 451 B.R. 573 (Bankr. S.D. Fla. 2011); In re Chance & Anthem, LLC, (Case No. 18-16248-MAM)[ECF No. 300].

35. The relief requested in this Motion, if approved, will result in a substantial benefit to the Debtor's bankruptcy estate, particularly any benefit that can be derived from potential litigation claims against third parties, including avoidance actions.

36. Accordingly, the Trustee requests relief to enable the Trustee to take over the administration of such property and commence the orderly liquidation of such assets for the benefit of the creditors of the Debtor's bankruptcy estate.

**WHEREFORE**, the Trustee respectfully requests the entry of an Order granting the relief requested herein and awarding any such further relief as the Court deems just and appropriate.

Dated: February 3, 2023

By: /s/ Mark Bonacquisti
       Mark Bonacquisti, Esq.
       FBN 0703257
       mark@msbankrupt.com

By: /s/ Zachary Malnik
       Zachary Malnik, Esq.
       FBN 1010272
       zachary@msbankrupt.com

       The Salkin Law Firm
       P.O. Box 15580
       Plantation, Florida 33318
       954-423-4469

Exhibit "A"- List of Interested Parties

GLOBAL ENERGY SCIENCES, LLC
Jenkins, Elina B R/A
170 SE 13TH ST
POMPANO BEACH, FL 33060

RAW ENERGY MATERIALS, CORP.
SMITH, DON R/A
170 SE 13th st
POMPANO BCH, FL 33060

RAW MATERIALS CORP
SMITH, DONALD R R/A
170 SE. 13TH. ST.
POMPANO BEACH, FL 33060

RAW LLC
SMITH, DONALD R R/A
170 SE 13TH ST
POMPANO BEACH, FL 33060

ROCK REBAR INC.
JENKINS, ELINA R/A
2681 NE 4TH AVE
POMPANO BEACH, FL 33064

ROCK REBAR INC.
Jenkins, Elina B R/A
170 SE 13TH ST
POMPANO BEACH, FL 33060

YELLOW TURTLE DESIGN, LLC
JENKINS, ELINA B R/A
170 SE 13th street
Pompano Beach, FL 33060

Donald Smith
170 SE 13TH ST
POMPANO BEACH, FL 33060

Elina Jenkins
170 SE 13TH ST
POMPANO BEACH, FL 33060

BASALT WORLD CORP.
Smith, Don R/A
170 SE 13TH ST
POMPANO BEACH, FL 33060

Citibank, National Association
5800 S. Corporate Place
Sioux Falls, SD 57108

American Express Company
c/o CT Corporation System
1200 S. Pine Island Road
Plantation, FL 33324

Bank of America, National Association
100 N. Tryon Street
Charlotte, NC 28202

Bank of America, National Association
c/o CT Corporation System
1200 South Pine Island Road
Plantation, FL 33324

Chase Bank
c/o CT Corporation System
1200 South Pine Island Road
Plantation, FL 33324

Regulatory Resources LLC
1018 Roanoke Drive
Westfield, IN 46074

McHale & Slavin P.A.
c/o Michael A. Slavin
2855 PGA Blvd
Palm Beach Gardens, FL 33410

The Sacks Firm
c/o Michael Sacks
7210 Wisteria Avenue
Parkland, Florida 33076

Mitchell L. Taylor CPA P.A.
c/o Mitchell L. Taylor
4800 N. Federal Highway, D102
Boca Raton, FL 33431

Laura E. McGrew
345 North Fairway Avenue
Wichita, KS 67212

Golden Law
c/o Scott Golden
3107 Stirling Road, Suite 201
Fort Lauderdale, FL 33312