

**ORDERED in the Southern District of Florida on July 12, 2023.**



**Peter D. Russin, Judge**
**United States Bankruptcy Court**

---

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**FORT LAUDERDALE DIVISION**

In re:

                                                         Case No. 21-12188-PDR

No Rust Rebar, Inc.,

                                                         Chapter 7

        Debtor.

_____/

**ORDER GRANTING TRUSTEE'S MOTION**
**TO SUBSTANTIVELY CONSOLIDATE**

    This matter came before the Court upon the Trustee's Motion to Substantively

Consolidate Raw Materials Corp. ("RMC"), Raw Energy Materials, Corp. ("REM"),

Global Energy Sciences, LLC ("GES"), and Raw, LLC ("Raw") into the Debtor's estate (the "Motion").[1] For the reasons that follow, the Court hereby grants the Motion.

## JURISDICTION & VENUE

The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1334(b). The Court has statutory authority to hear and determine this case under 28 U.S.C. §157(b)(2)(A) and the general order of reference from the United States District Court for the Southern District of Florida. S.D. Fla. Local Rule 87.2(a). Venue is proper under 28 U.S.C. § 1409(a).

## PROCEDURAL BACKGROUND AND FINDINGS OF FACT

Don Smith ("Smith") is the founder and owner of No Rust Rebar, Inc., the Debtor.  He is also the founder of RMC, REM, GES and Raw, the companies the Trustee seeks to substantively consolidate into the Debtor's estate (the "Target Companies").

On March 5, 2021, No Rust filed a voluntary Chapter 11 bankruptcy petition. On August 5, 2021, Green Tech filed a Motion for Removal of No Rust as Debtor in Possession[2] and, on November 21, 2021, filed its related Motion to Convert Chapter 11 Case to Chapter 7.[3] On May 23, 2022, after a four-day evidentiary hearing, the

---

[1] (Doc. 385).

[2] (Doc. 70).

[3] (Doc. 116).

Court entered an order converting the case from Chapter 11 to Chapter 7.[4] In the Conversion Order[5] the Court made the following relevant factual findings: [6]

In the 1980s, while operating a boat manufacturing and design business, Don Smith came into the possession of a significant amount of basalt fibers. Smith became fascinated with the material and believed that he could use it to create a replacement for traditional structural reinforcement products, such as rebar, with the advantage that basalt does not rust. However, Smith never patented the process and chose to maintain it in his own head because he was worried that he did not have the means to defend a patent. When the idea of using basalt fibers as structural reinforcement became less financially viable due to the crash of the housing market in the mid 2000s, Smith shifted his focus to the energy sector and founded Raw Energy Materials, Inc. ("REM"), which used basalt fibers to create products for the wind industry.[7]

REM struggled because it was unable to manufacture basalt fibers itself and its product was large, expensive, and time consuming to produce. Smith, therefore, turned his interest back to manufacturing and selling structural reinforcement products, particularly rebar, made from basalt fibers. At a Christmas party in 2014, Smith met Robert Bryan, who was fascinated by Smith's idea. In January 2015,

---

[4] (Doc. 193).

[5] (Doc. 193).

[6] The Court adopts the relevant portion of its findings of fact from the Order Converting Case to Chapter 7 and restates them here.

[7] (Doc. 188 at 33:16–43:2, 45:2–18, 103:11–14).

following a $1.2 million investment from Bryan, No Rust Rebar, Inc. ("No Rust") was born. Though Bryan put no specific restrictions on Smith's use of the funds, he assumed they would be used exclusively for the benefit of No Rust and that the company's additional funding needs for things like research and development would be minimal.[8]

No Rust initially needed to secure a manufacturing facility. Bryan suggested that No Rust buy a $3 million property he owned in Georgia. Smith declined. Instead, Smith was interested in a foreclosed industrial facility in Pompano Beach, Florida that contained office space, meeting rooms, and an industrial facility, but required significant repairs and maintenance (the "Property"). Bryan suggested he could purchase the Property and No Rust could lease it from him. Again, Smith declined. In July 2015, against the wishes of Bryan, No Rust contracted to purchase the Property for $450,000 and paid a non-refundable $50,000 deposit that allowed it to occupy the premises and begin maintenance and repairs immediately. Bryan, angry that he had been seemingly squeezed out of the deal for the Property, refused to provide No Rust with any further funding. Without additional investment from Bryan, No Rust lacked the funds to close and risked losing both the Property and its $50,000 deposit.[9]

---

[8] (Docs. 1; 130-1; 130-2; 130-4; 138 at ¶ 1; 160 at 48:11–14; 170 at 52:4–56:4, 58:5–63:24, 81:4–16; 188 at 43:3–44:20).

[9] (Docs. 130-5; 160 at 15:18–24; 170 at 77:3–97:3, 106:16–110:11; 188 at 47:15–56:14, 78:9–79:13).

Desperate for a solution, Smith turned to a friend, Joan Saperstein, for help. Saperstein created a new entity, Green Tech Development, LLC ("Green Tech") to which No Rust agreed to assign its right to purchase the Property. No Rust contends that consideration for the assignment included an option to purchase the Property from Green Tech, but Green Tech contends there was no such option. Both parties agree that there is no signed written agreement memorializing the purported option. In January 2016, Green Tech bought the Property and No Rust remained in possession.[10]

No Rust needed permits and a business license before it could begin manufacturing operations on the Property. Though No Rust filled out the applications, it needed Green Tech, as the owner of the Property, to sign them. For reasons that remain unclear, Green Tech refused. According to Smith, Green Tech's refusal was part of a concerted effort by associates of Green Tech to extort him into taking out a $10 million loan.[11]

In May 2016, No Rust executed, but never recorded, a $400,000 mechanics lien against the Property in favor of another company Smith had recently created, Raw Materials Corp. ("RMC"). RMC was created by Smith in September 2015 to provide fiber and resin packages to his entities and also operated out of the Property. When pressed about why RMC received the mechanics lien, Smith acknowledged it was "protection" for his entities to make the Property "less enticing" to Green Tech.

---

[10] (Docs. 130-8; 188 at 63:14–66:2, 80:25–81:8).

[11] (Doc. 188 at 81:9–85:18).

Shortly thereafter, Smith listed "No Rust Rebar, Inc." both as a fictitious name of RMC and as a d/b/a on RMC's bank account. Smith testified he did this so he could transfer checks made payable to No Rust to RMC when he, in his discretion, believed doing so was appropriate.[12]

In November 2016, Smith sought to exercise No Rust's purported option by filing a Notice of Election to Purchase Real Property, but Green Tech refused to sell. Less than a month later, No Rust sued Green Tech for specific performance; Green Tech countered seeking No Rust's ejectment and damages for civil trespass (the "Property Dispute").[13]

In December 2016, Smith founded Raw, LLC ("Raw"), which served as a holding company. Then, in January 2017, Smith reinstated an older entity, Global Energy Sciences, LLC ("GES"), to hold his intellectual property, including the trademark and brand licenses associated with his basalt rebar product. However, it appears No Rust paid the bills for at least some of GES's intellectual property and, at least once, transferred a patent to GES for no consideration. No Rust is obligated to pay GES $200/day ($73,000 annually) for a license to produce basalt rebar, though Smith testified that payment has not been required recently given No Rust's financial situation.[14]

---

[12] (Docs. 130-7; 130-20; 131-9; 138; 160 at 50:21–54:22, 134:23–155:19; 162 at 107:13–108:4; 170 at 25:4).

[13] (Doc. 160 at 63:3–65:7); *see No Rust Rebar, Inc. v. Green Tech Dev., LLC (In re No Rust Rebar, Inc.)*, No. 21-01111-PDR (Bankr. S.D. Fla.); *Green Tech Dev., LLC v. No Rust Rebar, Inc. (In re No Rust Rebar, Inc.)*, No. 21-01112-PDR (Bankr. S.D. Fla.).

[14] (Docs. 130-7; 130-13; 130-14; 160 at 58:8–64:17, 80:3–85:23, 177:18–179:9).

In February 2017, Smith used various entities to complete a deal with PayMeOn, Inc. ("PayMeOn"), a publicly traded company interested in the sale of Smith's basalt rebar (the "PayMeOn Deal"). Under the agreement, PayMeOn received an exclusive license to sell basalt rebar in Florida and the Caribbean. No Rust provided two machines, basalt fibers, and finished inventory to help close the deal, but in return received no consideration. RMC, however, received $2.4 million in cash and Raw received 10 million shares in PayMeOn.[15] In short, in exchange for No Rust's assets and No Rust losing its right to sell basalt rebar in Florida and the Caribbean, RMC received millions of dollars, Raw received millions of shares in a publicly traded company, and No Rust received nothing. Smith, however, contends that No Rust lost nothing because it was not presently selling product anyway and ultimately received reasonably equivalent value for the transaction in the form of new equipment and machinery.[16]

In 2019, the electric company cut the Property's power due to a split of the power source from the contiguous property; power has not been restored but a generator has provided some power. Since then, No Rust and the other entities operating from the Property have been severely limited in their ability to conduct any business at all.[17] Given that the Property is presently unusable for manufacturing

---

[15] Raw was also supposed to receive a consulting fee, but the testimony suggests that Raw received no cash and never held any assets other than the shares of PayMeOn stock. *See* (Docs. 131-18; 131-19; 160 at 62:8–64:17).

[16] (Docs. 131-18; 131-19; 160 at 62:8–64:17, 69:12–15, 93:24–95:10, 99:19–102:9, 105:6–108:12, 116:1–120:3, 121:11–127:25, 154:1–5; 162 at 39:21–49:12; 188 at 87:4–93:25).

[17] (Doc. 162 at 63:20–64:11).

and No Rust's rights to it were in dispute, No Rust could have chosen to lease another Property or take some other action to ramp up its prospective core business. However, Smith testified, in his business judgment, that was too expensive and not in No Rust's best interests.[18]

In September 2020, RMC registered "Raw, LLC" as a fictitious name. No explanation has been provided for this action. On March 5, 2021, No Rust registered "Raw, LLC" as a fictitious name. No explanation has been provided for this action either.[19]

Smith routinely transferred money amongst the Family[20] at his sole discretion, his bookkeeper served as the bookkeeper for the whole Family, and whenever assets appeared commingled amongst the Family, Smith would simply rely on his financial professionals to sort out any issues or confusion that might arise. Smith also used the same emblem on every Family member's checks. Smith explained that the Family failed to maintain corporate formalities largely because the Family included closely held companies that he personally controlled, he lacked clerical help to separate the Family's assets and liabilities, and "things began to get mixed up" once he "began to spend huge amounts of legal fees."[21]

---

[18] (Doc. 160 at 176:22–177:10).

[19] (Docs. 130-21; 131-6; 160 at 193:25–194:20).

[20] Smith used the "Family" to refer to No Rust, RMC, REM, and GES, but not Raw. For the Court's purposes, the "Family" or "Family Members" refers to all of Smith's related entities, including Raw and the Debtor. *See* (Docs. 138; 160 at 31:3–7; 50:21–55:22, 192:21–193:4, 198:13–17).

[21] (Docs. 130-20; 130-21; 131-6; 134-20; 160 at 16:18–17:1, 54:23–55:12, 87:25–93:5, 123:23–125:1, 128:21–133:11, 193:25–194:20, 207:7–209:10).

On March 5, 2021, No Rust filed a voluntary bankruptcy petition under Subchapter V of Chapter 11 of the Bankruptcy Code.[22] There are irregularities in No Rust's Schedules, including:[23]

1.  RMC's checking account is not listed in the Schedules even though "No Rust Rebar, Inc." is listed as a d/b/a on the account and the account was open on the Petition Date. According to Smith, the failure to include the account was not a mistake because, despite being listed as a d/b/a on the account, No Rust has no interest in the account.[24]

2.  The 2020 tax returns provide that No Rust is due nearly $492,000 from RMC, but No Rust did not list that accounts receivable as an asset in the Schedules. When pressed, Smith was unable to provide a sufficient explanation for what the debt due to No Rust is for or why it was not included in the Schedules but did acknowledge it should have been.[25]

3.  The 2020 tax returns showed that No Rust had no inventory, but No Rust scheduled some inventory on the Schedules. Smith explained that the inventory was not listed based on any consideration of corporate documentation but was rather determined by walking around the building (which holds other corporate entities' assets) and identifying certain pieces of inventory to include.[26]

4.  No Rust scheduled a $129,250 debt owed to Smith's sister resulting from a loan she gave to Smith personally in 2005, roughly a decade before No Rust was incorporated. Smith states he agreed to carry the debt into No Rust because No Rust "is the entity that came to fruition out of [her] original seed monies."[27]

---

[22] (Docs. 1; 130-21).

[23] (Docs. 19; 133-16; 173).

[24] (131-9; 160 at 144:10–155:19; 170 at 25:4).

[25] (Docs. 131-25; 160 at 199:16–203:9).

[26] (Doc. 188 at 210:8–25).

[27] (Docs. 19 at 16; 160 at 191:21–193:4).

Shortly after the Petition Date, on March 29, 2021, No Rust removed several actions from state court to this Court, including the Property Dispute.[28] The Court denied cross motions for summary judgment in the Property Dispute and the matter remains pending.[29]

There are only six total claims in this case. Two are related to the Property Dispute: (1) Green Tech asserts a $1.95 million claim arising from damages related to the Property Dispute,[30] and (2) Pet Star Corp. asserts a $1.05 million conditional claim arising from its mortgage on the Property.[31] No Rust objects to both claims as contingent, unliquidated, and disputed.[32] The other claims in this case include, (1) a $12,559.49 claim by the U.S. Small Business Administration,[33] (2) an $11,750.40 claim by Broward County for 2020 and 2021 tangible property taxes,[34] and (3) two claims by Broward County Water and Wastewater Services totaling $52,669.83 for services to the Property.[35]

---

[28] *See No Rust Rebar, Inc. v. Green Tech Dev., LLC (In re No Rust Rebar, Inc.)*, No. 21-01111-PDR (Doc. 1) (Bankr. S.D. Fla. Mar. 29, 2021) (the "Property Dispute"); *Green Tech Dev., LLC v. No Rust Rebar, Inc. (In re No Rust Rebar, Inc.)*, No. 21-01112-PDR (Doc. 1) (Bankr. S.D. Fla. Mar. 29, 2021).

[29] *See No Rust Rebar, Inc. v. Green Tech Dev., LLC (In re No Rust Rebar, Inc.)*, No. 21-01111-PDR, 2021 WL 4314221 (Bankr. S.D. Fla. Sept. 22, 2021).

[30] (Claim 4-1).

[31] (Claim 3-1).

[32] (Docs. 123; 125).

[33] (Claim 1-1).

[34] (Claim 2-2).

[35] (Claim 5-1; 6-1).

On April 14, 2021, as part of a litigation settlement agreement related to the PayMeOn Deal, Raw agreed to sell its 10 million shares in PayMeOn to Basanite, Inc. for $1.2 million.[36] The deal was not disclosed, and no Court approval was sought for the transaction. Because Raw does not have its own bank account, the funds were remitted to Smith. Smith contends that, even though Raw is No Rust's fictitious name, the settlement was unrelated to No Rust and there was not a need to disclose the settlement or seek court approval for it.[37]

On August 5, 2021, Green Tech filed its *Motion for Removal of Debtor as Debtor in Possession* and, on November 21, 2021, filed its related *Motion to Convert Chapter 11 Case to Chapter 7*.[38] No Rust opposed the motions.[39] The Court set an evidentiary hearing[40] and heard the *Motion for Removal*, the *Motion to Convert*, and the *Motion for Sanctions* on December 8, 2021, December 21, 2021, January 4, 2022, and January 10, 2022.[41] No Rust, Green Tech, and the Subchapter V Trustee submitted final briefs following the hearings.[42]

---

[36] Basanite appears to be a successor entity to PayMeOn.

[37] (Doc. 133-9; 133-10; 133-11; 160 at 55:8–18, 62:8–64:17, 70:19–23, 204:11–16; 162 at 49:13–53:23).

[38] (Docs. 70; 116).

[39] (Doc. 75).

[40] (Docs. 86; 141).

[41] (Docs. 160; 162; 170; 188).

[42] (Docs. 175; 176; 180).

Following the evidentiary hearing, No Rust amended its schedules. The only change in the Amended Schedules appeared to be that No Rust scheduled a $9,500 forklift that had previously been undisclosed.[43]

On May 23, 2022, after the four-day evidentiary hearing, the Court entered its Conversion Order.[44] The Trustee now seeks to substantively consolidate the various Family Members,[45] arguing that the Conversion Order finds all necessary facts to support the relief. In opposition, the Target Companies argue: (i) The allegations[46] in the Motion are insufficient to establish entitlement to the extraordinary remedy of substantive consolidation; (ii) The Court lacks personal jurisdiction over the Target Companies; (iii) The relief sought by Motion lacks procedural due process; and (iv) The Target Companies have factual and legal defenses to the relief sought.

## ANALYSIS

### A.  Substantive Consolidation.

Although the Code itself does not expressly allow for substantive consolidation, a bankruptcy court has the power to substantively consolidate various estates under its general equitable powers contained in § 105(a). *In re Reider*, 31 F.3d 1102 (11th Cir. 1994); *FDIC v. Colonial Realty*, 966 F.2d 57, 59 (2d Cir. 1992); *In re Bonham*, 229 F.3d 750, 764 (9th Cir. 2000); *In re Giller*, 962 F.2d 796, 799 (8th Cir. 1992). However,

---

[43] (Doc. 173 at 7).

[44] (Doc. 193).

[45] (Doc. 385).

[46] While referred to as allegations, the Motion is relying solely upon the findings of fact in the Court's Conversion Order.

because substantive consolidation usually harms some creditors, courts apply the doctrine sparingly and only when the proponent can show that it is necessary to achieve a fair and equitable distribution of the debtors' collective assets. *See generally In re Archdiocese of Saint Paul & Minneapolis*, 888 F.3d 944, 950 (8th Cir. 2018).

Substantive consolidation can be applied to non-debtor third parties, and such a scenario was implicitly recognized by the Supreme Court in *In re Sampsell v. Imperial Paper Corp.,* 313 U.S. 215 (1941), and has been expressly approved by many other courts. *See e.g. In re United Stairs Corp,* 176 B.R. 359 (Bankr. D. N.J. 1995); *In re Tureaud,* 59 B.R. 973 (N.D. Okla. 1986); *In re Crabtree*, 39 B.R. 718 (Bankr. E.D. Tenn. 1984); *In re 1438 Meridian Place N.W., Inc.,* 15 B.R. 89 (Bankr. D. D.C. 1981).

In *Federal Deposit Ins. Corp. v. Hogan (In re Gulfco Invest. Corp.),* 593 F.2d 921 (10th Cir.1979) the court found consolidation of a debtor and non-debtor was appropriate and held:

> The power to consolidate authorizes the court to pierce the several corporate veils and to disregard the existence of the separate corporate entities. Thus, where a corporation is a mere instrumentality or alter ego of the bankrupt corporation, with no independent existence of its own, equity would favor disregarding the separate corporate entities. It is, of course, proper to disregard a separate legal entity when such action is necessary to avoid fraud or injustice.

*Gulfco*, 593 F.2d at 928. The court in *Gulfco* further stressed that for substantive consolidation to be appropriate, the assets of the debtor and non-debtor entities must be "hopelessly commingled." *Id.* at 929.

The Trustee's Motion for Substantive Consolidation primarily relies upon *Eastgroup Properties v. Southern Motel Association Ltd.,* 935 F.2d 245 (11th Cir.

1991) as setting the standard for substantive consolidation. *Eastgroup* itself relies upon the seven factors set forth in *re Vecco Const. Indus., Inc.*, 4 B.R. 407 (Bankr. E.D. VA. 1980), while introducing five additional considerations.

The *Vecco* factors are:

(1) The degree of difficulty in segregating and ascertaining individual assets and liabilities;
(2) The presence or absence of consolidated financial statements;
(3) The profitability of consolidation at a single physical location;
(4) The commingling of assets and business functions;
(5) The unity of interests and ownership between the various corporate entities;
(6) The existence of parent and intercorporate guarantees on loans; and
(7) The transfer of assets without formal observance of corporate formalities.

The additional factors enumerated by in *Eastgroup* are:

(1) the parent owning the majority of the subsidiary's stock;
(2) the entities having common officers or directors;
(3) the subsidiary being grossly undercapitalized;
(4) the subsidiary transacting business solely with the parent; and
(5) both entities disregarding the legal requirements of the subsidiary as a separate organization.

*Eastgroup* 935 F.2d at 249-250. The Court applies the factors as follows:

1. <u>Difficulty In Segregating and Ascertaining Individual Assets and Liabilities and The Commingling of Assets and Business Functions.</u>

In *Vecco* the court looked to the difficulty in segregating assets of the individual entities, namely considering "whether the individual assets of the corporate entities were so unascertainable and hopelessly obscured as to entail substantial expense in segregating such assets and liabilities, as to threaten the realization of net assets for the benefit of creditors." *Vecco* 4 B.R. at 410. Based on the Court's findings in the Conversion Order, it is impossible to objectively discern with reasonable certainty

what assets actually belong to the Debtor or the other Family Members. The Court found that Smith is the principle, majority shareholder, and president of each of these entities. The "bookkeeper served as the bookkeeper for the whole Family".[47] "Smith listed 'No Rust Rebar, Inc.' both as a fictitious name of RMC and as a d/b/a on RMC's bank account. Smith testified he did this so he could transfer checks made payable to No Rust to RMC when he, in his discretion, believed doing so was appropriate."[48] And "Smith also commingled No Rust's assets with the assets of other Family Members' through his unusual and improper practice of listing the formal name of one entity as the d/b/a or fictitious name of another."[49]

Further, each of the Family Members operated out of the same location, and physical assets of the Debtor were only identified by Smith "walking around the [Property] (which holds other corporate entities' assets) and identifying" inventory personally.[50] As "Smith commingled No Rust's assets with those of the Family and possibly himself, regularly transferred assets between No Rust and other Family Members at his sole discretion and failed to maintain sufficient records showing the nature of those transfers and transactions,"[51] the Court finds that segregating and ascertaining the individual assets of the Debtor and other Family Members is

---

[47] (Doc. 193 at 11).

[48] (Doc. 193 at 4-5).

[49] (Doc. 193 at 20).

[50] (Doc. 193 at 8).

[51] (Doc 193 at 22).

sufficiently difficult, and the assets and business functions of the Family Members are "hopelessly comingled," thereby supporting substantive consolidation.

    2. <u>The presence or absence of consolidated financial statements.</u>

In *Vecco,* the court relied upon *Soviero v. Franklin Nat'l Bank* in determining that consolidated financial statements could be considered in deciding whether to substantively consolidate. Notably, *Soviero* considered both consolidated financial statements and the comingling of funds in its analysis. 328 F.2d 446, 448 (2d Cir. 1964).

In this case, while no findings were made with respect to the presence or absence of consolidated financial statements, the Court did make findings as to the comingling of funds. When Raw sold its ten million shares in PayMeOn, "[b]ecause Raw does not have its own bank account, the funds were remitted to Smith [individually]"[52] and Smith listed "No Rust Rebar, Inc." both as a fictitious name of RMC and as a d/b/a on RMC's bank account so he could deposit checks made out to No Rust into RMC's account.[53] Thus, while the Court lacks evidence with respect to the Family Member's financial statements, the finances of the various Family Members were comingled, and so even if the financial statements themselves were not consolidated, that fact alone is insufficient to overcome the remaining factors which overwhelmingly support substantive consolidation.

    3. <u>The profitability of consolidation at a single physical location.</u>

---

[52] (Doc. 193 at 9).

[53] (Doc 193 at 4; 21).

While mainly relevant in cases where a reorganization is possible, the "continued profitability of corporate entities operating on a consolidated basis" is relevant where the continued operation of the businesses depends on their operating at a single physical location. *Vecco* 4 B.R. at 411 (Citing *Commercial Envelope Manufacturing Co., Inc.*, 3 BCD 647, 650 (S.D.N.Y. 1977)). Accordingly, this factor is not directly applicable where, as was the case in *Vecco*, each of the Family Members already operates from the same business location, and where the Trustee is pursuing liquidation rather than reorganization.

4. The unity of interests and ownership between the various corporate entities.

Each of the Family Members operates from the same location;[54] Smith listed "No Rust Rebar, Inc." both as a fictitious name of RMC and as a d/b/a on RMC's bank account so he could deposit checks made out to No Rust into RMC's account;[55] Raw does not have its own bank account, and so funds from the PayMeOn deal were remitted to Smith directly;[56] Smith used the same corporate emblem on the checks for the entire Family;[57] and Smith is the principle, majority shareholder, president, and representative of each of the Family Members. Accordingly, the Court funds that there exists a unity of interest and ownership common to all the Family Members. *Vecco* 4 B.R. at 411.

---

[54] (Doc. 193 at 8).

[55] (Doc 193 at 4; 21).

[56] (Doc. 193 at 9).

[57] (Doc. 193 at 20).

5.  <u>The existence of parent and intercorporate guarantees on loans.</u>

The Family members effectively made loans to one another. The 2020 tax returns provide that No Rust is due nearly $492,000 from RMC, but No Rust did not list that account receivable as an asset in the bankruptcy schedules. When pressed, Smith was unable to provide a sufficient explanation for what the debt due to No Rust is for or why it was not included in the schedules but did acknowledge it should have been.[58]

In addition, No Rust executed, but never recorded, a $400,000 mechanics lien against the Property in favor of RMC,[59] and while doing so may have been, according to Smith for the purpose of "protection" for his entities to make the Property "less enticing" to Green Tech, it shows that Smith used the Family Members in concert to achieve their strategic financial goals, a fact supporting substantive consolidation.

6.  <u>The transfer of assets without formal observance of corporate formalities.</u>

The Court has found, and the facts readily support that the Family Members failed to maintain corporate formalities.[60] Further, the "companies were engaged in numerous inter-company activities which resulted in frequent transfers of assets." *Vecco* 4 B.R. at 411. Namely, No Rust paid the bills for at least some of GES's intellectual property and, at least once, transferred a patent to GES for no consideration. No Rust is also obligated to pay GES for a license to produce its basalt

---

[58] (Docs. 131-25; 160 at 199:16–203:9).

[59] (Doc. 193 at 4).

[60] (Doc. 193 at 11).

rebar product;[61] Smith listed "No Rust Rebar, Inc." both as a fictitious name of RMC and as a d/b/a on RMC's bank account so he could deposit checks made out to No Rust into RMC's account;[62] Raw does not have its own bank account, and so funds from the PayMeOn deal were remitted to Smith directly;[63] Smith used the same corporate emblem on the checks for the entire Family;[64] and Smith commingled No Rust's assets with those of the Family and possibly himself. Smith regularly transferred assets between No Rust and other Family members at his sole discretion and failed to maintain sufficient records showing the nature of those transfers and transactions.[65] Accordingly, this factor weighs heavily in support of consolidation.

7. <u>Commonality of officers and directors.</u>

Smith is the principle, majority shareholder, president, and representative of each of the Family Members.

8. <u>The parent owning the majority of the subsidiary's stock; the subsidiary being grossly undercapitalized; the subsidiary transacting business solely with the parent.</u>

The Family Members do not have a parent-subsidiary relationship. However, the Court found that Raw has no bank account and its only business has ever been to

---

[61] (Doc. 193 at 5).

[62] (Doc. 193 at 4; 21).

[63] (Doc. 193 at 9).

[64] (Doc. 193 at 20).

[65] (Doc. 193 at 22).

hold the PayMeOn stock for the Debtor,[66] and GES exists for the purpose of holding the Debtor's intellectual property.[67] Accordingly, the Court considers factors one, three, and four implicated by the facts of this case. For example, without a bank account of its own, the Court is unable to see how Raw could be adequately capitalized as an independent entity. Further, the fact that Smith is the sole shareholder of each Family Member, and the fact that the majority of the Family Members primarily, if not solely engage in business with one another all tend to support that *Eastgroup* factors one, three, and four would weigh in favor of consolidation if they are applicable outside of a strictly parent-subsidiary type business relationship. The court in *Eastgroup* indicated that the five additional factors they set forth (themselves from *Pension Benefit Guar. Corp. v. Ouimet Corp.*, 711 F.2d 1085, 1093 (1st Cir.1983)) "could be presented in some cases" and so, naturally, may not apply in all cases. However, the court explained that the factors in *Vecco* and *Ouimet* were only "examples of information that may be useful to courts charged with deciding whether there is a substantial identity between the entities to be consolidated and whether consolidation is necessary to avoid some harm or to realize some benefit." *Eastgroup* 935 F.2d at 250.

 *Ouimet* was itself analyzing a 'brother-sister' relationship (as defined under I.R.C. § 1563(a)(2)) rather than a 'parent-subsidiary' relationship (also defined in the same statute). Here, the relationship between the Family Members is quite similar

---

[66] (Doc 193 at 21).

[67] (Doc 193 at 5)

to that of the *Ouimet* companies as Smith is the sole shareholder of each Family Member which by definition makes them brother-sister entities.

As a specifically parent-subsidiary relationship is not the only applicable form by which a group of related companies may be judged in the substantive consolidation context, the Court finds, considering the facts set forth above, that the Family Members share a substantial identity and thus these factors weigh in favor of consolidation.

9. <u>Both entities disregarding the legal requirements of the subsidiary as a separate organization.</u>

The Debtor's transactions with the Family Members were one sided, in that the Debtor transferred assets to them for no consideration, and this Court specifically found that the Debtor failed to observe corporate formalities in several respects. "[A]t least once, [No Rust] transferred a patent to GES for no consideration. No Rust is obligated to pay GES $200/day ($73,000 annually) for a license to produce basalt rebar" [68]

"Under the agreement, PayMeOn received an exclusive license to sell basalt rebar in Florida and the Caribbean. No Rust provided two machines, basalt fibers, and finished inventory to help close the deal, but in return received no consideration. RMC, however, received $2.4 million in cash and Raw received ten million shares in PayMeOn. In short, in exchange for No Rust's assets and No Rust losing its right to sell basalt rebar in Florida and the Caribbean, RMC received millions of dollars, Raw

---

[68] (Doc. 193 at 5).

received millions of shares in a publicly traded Company, and No Rust received nothing." [69]

"Smith explained that the Family failed to maintain corporate formalities largely because the Family included closely held companies that he personally controlled, he lacked clerical help to separate the Family's assets and liabilities, and things began to get mixed up."[70]

Accordingly, the Court finds that the majority of the *Vecco* and *Eastgroup* factors weigh heavily in favor of substantive consolidation. Nevertheless, *Eastgroup* envisions that, even when the various factors weigh in favor of consolidation, there should be an opportunity for an interested party to rebut the conclusion that consolidation is warranted by allowing a creditor of one of the entities that is the target of the consolidation motion to show that (1) that creditor has relied on the separate credit of one of the entities to be consolidated; and (2) that the creditor will be prejudiced by substantive consolidation. *Eastgroup* 935 F.2d at 251.

The function of the rebuttal described in *Eastgroup* is to provide evidence that (1) a creditor recognized (or was perhaps duped into believing) that the specific entity to be consolidated was a separate entity from the other consolidation targets, and this also serves as evidence that the entities did not in fact share a substantial identity; and (2) that the consolidation would harm the objecting creditor by preventing it from

---

[69] (Doc. 193 at 6).

[70] (Doc. 193 at 11) (internal quotations omitted).

being able to pursue greater recovery against the entity individually, than it could against the consolidated entities.

Here, although properly noticed by first class US mail as required under FRBP 7004(b),[71] none of the twenty plus creditors of any of the Target Companies has stepped forth to argue under the rebuttal permitted by *Eastgroup*. The Target Companies have not argued themselves that they do not in fact share a substantial identity, or that consolidation would not be beneficial to the estate. Further, the Target Companies' objection does not allege that their creditors will be unduly prejudiced by consolidation. In fact, the Target Companies only make procedural arguments, despite the Court specifically requesting and providing opportunity for them to submit supplemental briefing on any and all of their substantive arguments against consolidation.

At the March 2, 2023 hearing, after a discussion of the substance of the Motion and response, counsel indicated that the Target Companies' response was particularly brief as he had only been afforded one day to prepare it after being retained. Placing a strong emphasis on ensuring that procedural due process is afforded, the Court requested further briefing by both parties. The Court made it abundantly clear that the Target Companies response needed to be fulsome, and it was specifically discussed that such a response would likely need to address the *Vecco* and *Eastgroup* analyses, among other questions raised by the Court during the hearing. While the Court desired to limit the volume of the supplemental briefing, it

---

[71] (Doc. 389).

was made clear that requests for additional time, extensions of page limits, or other accommodations would be afforded upon request by either party. Thus, despite being provided ample opportunity, the Target Companies raised no substantive arguments in opposition to consolidation or to contest the applicability the *Vecco* and *Eastgroup* factors.

B. <u>Substantive Consolidation by Motion.</u>

The Trustee seeks substantive consolidation of non-debtor entities with the Debtor. The due process rights of those non-debtor entities must be preserved. Courts have addressed substantive consolidation in a variety of procedural settings, including by motion in the main case, as here, and through the commencement of an adversary proceeding.

The Target Companies argue that, under FRBP 7001, the pursuit of substantive consolidation by motion is improper, as it seeks "equitable relief" under FRBP 7001(7) and so must be conducted by adversary proceeding. Alternatively, the Target Companies argue that, under FRBP 7001(8), since their claims against the debtor will be subordinated because of consolidation, this matter must be conducted by adversary proceeding. The Court disagrees with both arguments.

1. <u>Federal Rule of Bankruptcy Procedure 7001(7).</u>

FRBP 7001 provides the "following are adversary proceedings: ... (7) a proceeding to obtain an injunction or other equitable relief, except when a chapter 9, chapter 11, chapter 12, or chapter 13 plan provides for the relief." The Target Companies argue that because FRBP 7001 defines "adversary proceeding" to include

"a proceeding to obtain an injunction or other equitable relief," and because substantive consolidation is a form of equitable relief such relief can only be sought by adversary proceeding.

The Court disagrees. The "other equitable relief" under 7001(7) generally refers to relief "consistent with the nature of an injunction." *In re Protea Biosciences, Inc.*, 17-BK-1200, 2018 WL 5734464, at *4 (Bankr. N.D.W. Va. Oct. 30, 2018). The mere fact that a bankruptcy court is providing some form of equitable relief does not mandate an adversary proceeding where the equitable relief is not based upon conduct that might be remedied by an injunction as contemplated by FRBP 7001(7).

To argue that Rule 7001(7) requires every form of equitable relief that may be pursued in a bankruptcy court be conducted by adversary proceeding cannot be the law since that would require commencing an adversary proceeding for even mundane equitable matters commonly brought by motion. The Target Companies offer no support for such a proposition.

2.  <u>Federal Rule of Bankruptcy Procedure 7001(8).</u>

While not addressed in the Target Companies' Objection[72] or Response,[73] counsel suggested at the hearing that consolidation must be pursued by adversary proceeding under Rule 7001(8), which includes as an adversary proceeding: "a proceeding to subordinate any allowed claim or interest, except when a chapter 9, chatper11, chapter12, or chapter 13 plan provides for subordination." The Target

---

[72] (Doc. 391).

[73] (Doc. 395).

Companies argue that creditors' claims against the Target Companies would effectively be "subordinated," presumably to the claims against the Debtor. However, counsel cited no case law in support of this position.

The Target Companies misunderstand the concept of substantive consolidation. If the Target Companies are substantively consolidated with the Debtor, they will become as one, in which case all of their assets will be deemed owned by the consolidated entity, and all of the claims against all of the entities would be against the consolidated entity. None of the claims will have been subordinated to any other claims by virtue of the consolidation.

3. <u>Substantive Consolidation by motion is generally proper.</u>

The 11th Circuit has found that consolidation may be properly sought by motion. In *Eastgroup* the court stated "[the] standard, which we adopt today, [is used] to determine whether to grant a motion for substantive consolidation." *Eastgroup*, 935 F.2d 245 at 249. Applying the applicable case law, the Court finds it may substantively consolidate a non-debtor with a bankruptcy debtor by motion. *See e.g., In re Notez, LLC* (Case No. 18-19109-RAM) (Bankr. S.D. Fla.) [Doc. 102]; *In re Puig,* Case No. 07-14026-RAM (Bankr. S.D. Fla.) [Doc. 2139]; *In re Rollaguard Security, LLC., et al.*, Case No. 14-38071-EPK (Bankr. S.D. Fla.) [Doc. 857]; *In re CLSF III IV, Inc., et al.*, Case No. 12-30081-EPK (Bankr. S.D. Fla.) [Doc. 857]; *see also In re Alico Mining, Inc.*, 278 B.R. 586 (Bankr. M.D. Fla. 2002); *Munford, Inc. v. TOC Retail, Inc., (In re Munford, Inc.),* 115 B.R. 390 (Bankr. N.D. Ga. 1990); *In re Crabtree*, 39 B.R. 718 (Bankr. E.D. Tenn. 1984); *Matter of New Center Hospital*, 187 B.R. 560 (E.D.

Mich. 1995); *In re DRW Property Co.* 82, 54 B.R. 489 (Bankr. N.D. Tex.1985); *In re United Stairs Corp.*, 176 B.R. 359 (Bankr. D.N.J. 1995). Courts have reliably held that an adversary proceeding is not necessary when pursuing consolidation.

> With exceptions, Bankruptcy Rule 7001(1) requires an adversary proceeding in order to recover money or property. Substantive consolidation, however, is not tantamount to turnover. Instead, substantive consolidation is an equitable, judicial remedy that is distinct from the express, statutory remedies of turnover or other recovery actions. Substantive consolidation is traditionally sought by motion.

*In re Archdiocese of St. Paul & Minneapolis*, 553 B.R. 693, 699 (Bankr. D. Minn. 2016).

C. <u>Notice.</u>

When substantive consolidation is sought by motion, notice to the Target Companies must be adequate to satisfy due process concerns. Courts have stated that, at minimum, due to the nature of substantive consolidation of debtor and non-debtor entities, notice must be provided to all creditors, and such creditors must have an opportunity to be heard. *See Drabkin v. Midland-Ross Corp. (In re Auto-Train Corp.)*, 810 F.2d 270, 279 ((D.C. Cir. 1987)); *United States v. AAPC, Inc.* (*In re AAPC, Inc.*), 277 B.R. 785, 789-90 (Bankr. D. Utah 2002); *Morse Operations, Inc. v. Robins Le-Cocq, Inc.* (*In re Lease-A-Fleet, Inc.*), 141 B.R. 869, 873 (Bankr. E.D. Penn. 1992). With respect to substantive consolidation hearings, "the notice must be given in such a manner that is likely to reach its intended audience.  [T]he content of the notice must reasonably inform the recipient of the nature of the upcoming proceeding." *Auto-Train*, 810 F.2d at 278. "The important thing, for due process purposes, is notice and

an opportunity to be heard. *In re Bonham*, 226 B.R. 56, 94 (Bankr. D. Alaska 1998), subsequently aff'd, 229 F.3d 750 (9th Cir. 2000).

As a contested matter, the Motion falls within the scope of FRBP 9014, which makes the 7000 series of rules applicable, as in an adversary proceeding. In this case, the Trustee has served the Motion and Notice of Hearing by first class mail,[74] in compliance with Rule 7004, upon "all of the Debtor's creditors, all known creditors of [Target Companies], and potential interested parties"[75] as well as each of the Target Companies themselves, and Don Smith personally. The Trustee also served[76] the Order Continuing the Hearing,[77] and the Amended Notice of Hearing[78] upon some twenty-plus creditors, consistent with the Trustee's service of the original Motion. Further, the Target Companies have all responded and were represented at each of the several hearings on this Motion. Neither Smith nor the Target Companies have argued that they or any creditors or equity holders of the Target Companies did not receive adequate notice.

Additionally, the Motion and notice of hearing were served upon Don Smith, and the various Target Companies by First Class Mail approximately three weeks before the Court's initial hearing on the Motion, the same manner of personal service

---

[74] (Doc. 389).

[75] (Doc. 385 at 15).

[76] (Doc. 392).

[77] (Doc. 393).

[78] (Doc. 424).

applicable to an adversary complaint as required by FRBP 7004, albeit without a formal summons.[79]

The Court finds that the Trustee has adequately served the Motion and notices of hearing upon the Target Companies as well as every other conceivably interested party. Indeed, other than a lack of a summons, service was equivalent to that which would have been required in an adversary proceeding under Rule 7004(a).

Further, the Target Companies were afforded an adequate opportunity to be heard as the Court conducted two hearings on the Motion[80] and provided the Target Companies an additional opportunity to brief any substantive arguments they had in opposition. Furthermore, the Trustee was ordered to provide additional detail as to the facts supporting consolidation prior to the Target Companies' response. Accordingly, the Court finds that notice of these proceedings was adequate.

D. <u>Substantive Consolidation of a non-debtor third party.</u>

More than 80 years ago the Supreme Court found consolidation of a debtor and non-debtor was appropriate in *Sampsell v. Imperial Paper and Color Corp.*, 313 U.S. 215, 218-19 (1941) (finding consolidation of a non-debtor proper where the purpose of a transfer of property to the non-debtor was to hinder, delay or defraud the debtor's creditors). Since then, several courts have indirectly acknowledged, or at least have not rejected, the concept that bankruptcy courts have the power to substantively consolidate a debtor with a non-debtor entity. In *re Auto-Train Corp., Inc.*, 810 F.2d

---

[79] (Doc. 389).

[80] (Docs. 388; 392)

270, 279 (D.C. Cir. 1987), a case relied upon by the Eleventh Circuit in *Eastgroup*, the court assumed the propriety of substantive consolidation of a non-debtor subsidiary into its debtor parent. *See also*, *Kapila v. S & G Fin. Servs., LLC (In re S&G Fin. Servs.)*, 451 B.R. 573, 580 (Bankr. S.D. Fla. 2011) (finding consolidation of a non-debtor proper upon findings that corporate formalities were not observed, assets and business functions were comingled, and common sole principals between the entities). Further, nothing in *Eastgroup* itself suggests that substantive consolidation of a debtor and non-debtor entity would be inappropriate.

Indeed, bankruptcy courts in Florida and in numerous other states have expressly recognized the bankruptcy court's ability to substantively consolidate a debtor with a non-debtor and have done so consistently and reliably. *See, e.g.*, *In re Alico Mining, Inc.*, 278 B.R. 586 (Bankr. M.D. Fla. 2002); *Munford, Inc. v. TOC Retail, Inc.* (*In re Munford, Inc.*), 115 B.R. 390 (Bankr. N.D. Ga. 1990); *In re Crabtree*, 39 B.R. 718, 721 (Bankr. E.D. Tenn. 1984); *Matter of New Center Hospital*, 187 B.R. 560 (E.D. Mich. 1995); *In re United Stairs Corp.*, 176 B.R. 359 (Bankr. D.N.J. 1995); *In re 1438 Meridian Place, N.W., Inc.*, 15 B.R. 89 (Bankr. D.C. 1981).

E. Collateral estoppel as applied to the non-debtor target companies.

To claim the benefit of collateral estoppel the party relying on the doctrine must show that: (1) the issue at stake is identical to the one involved in the prior proceeding; (2) the issue was actually litigated in the prior proceeding; (3) the determination of the issue in the prior litigation must have been "a critical and necessary part" of the judgment in the first action; and (4) the party against whom collateral estoppel is asserted must have had a full and fair opportunity to litigate

the issue in the prior proceeding. *Christo v. Padgett*, 223 F.3d 1324, 1339 (11th Cir. 2000); *Winn-Dixie Stores, Inc. v. Dolgencorp*, LLC, 746 F.3d 1008, 1036 (11th Cir. 2014); s*ee also In re MSR Resort Golf Course LLC*, 515 B.R. 36, 49-50 (Bankr. S.D.N.Y. 2014).

1. <u>The issue at stake is identical to the one involved in the prior proceeding</u>.

In this case, the matter of substantive consolidation was not directly raised during the conversion proceedings. However, the Trustee argues that the facts found in the Conversion Order are identical to those which would need to be found for consolidation to be appropriate.

Once a court decides an issue of fact or law necessary to its judgment, that decision precludes re-litigation of the same issue on a different cause of action between the same parties. *Kremer v. Chem. Constr. Corp.*, 456 U.S. 461, 466 n.6 (1982). The doctrine of collateral estoppel can apply to preclude re-litigation of both issues of law and issues of fact if those issues were conclusively determined in a prior action. *United States v. Stauffer Chemical Co.*, 464 U.S. 165, 170 (1984).

The court in *Winn-Dixie* provides that courts should "consider factors like those elaborated in the Restatement comments when determining the identity of issues." 746 F.3d at 1036-37. Here the Court considers the following question laid out in *Winn-Dixie* as determinative: Is there a substantial overlap between the evidence or argument to be advanced in the second proceeding and that advanced in the first? Issues are identical for collateral estoppel purposes where "the issues presented by [the current] litigation are in substance the same as those resolved" in the previous

litigation. *Montana v. United States*, 440 U.S. 147, 155 (1979). However, the facts of the two cases do not need to be identical so long as any factual differences have no legal significance in resolving the issues presented in both cases. *Nat'l Med. Imaging, LLC v. Ashland Funding LLC*, 648 F. App'x 251, 256 (3d Cir. 2016) (internal quotation marks omitted). Thus, if the facts which were necessary to the Conversion Order are identical to those necessary to order consolidation, collateral estoppel may apply.

Although the legal theory of consolidation is different than conversion, the two actions involve identical issues of fact, and the Conversion Order contains the Court's factual findings on those issues. A bankruptcy court may rely on collateral estoppel to reach conclusions about certain facts, foreclose re-litigation of those facts, and then consider those facts as evidence in support of another legal issue with an identical factual predicate. *see Thomas v. Loveless (In re Thomas)*, 288 F. App'x 547, 548 (11th Cir. 2008) (citation omitted); *see also Kane v. Stewart Tilghman Fox & Bianchi, P.A.*, 485 B.R. 460, 473 (S.D. Fla. 2013) (finding proper the bankruptcy court's application of collateral estoppel to certain factual findings in an order dismissing a Chapter 11 proceeding for bad faith as to the issue of non-dischargeability in an adversary proceeding, as both were premised on the same factual issues). Accordingly, it is proper for the Court to rely upon those findings now. *Tugz Intern., L.L.C. v. Canaveral Port Auth.*, No. 6:03-cv-1782-Orl-22JGG, 2005 WL 6046066, at *6 (M.D. Fla. Feb. 2, 2005).

The Court finds that no new evidence or argument is necessary to adjudicate the issue of substantive consolidation. All of the essential factual findings in support of consolidation have already been found, the questions presented under the consolidation analysis are identical to those already decided in the Conversion Order, and so the issues at stake are identical to those previously decided.

2. <u>The issue was actually litigated in the prior proceeding.</u>

"[W]hen an issue is properly raised, by the pleadings or otherwise, and is submitted for determination, and is determined, the issue is actually litigated." *Pleming v. Universal-Rundle Corp.*, 142 F.3d 1354, 1359 (11th Cir.1998) (quoting Restatement (Second) of Judgments § 27 cmt. d (1982)). Intrinsically, when the factual issues involved in each proceeding are identical, then those factual issue were actually litigated in the prior proceeding. Further, there is no distinguishing element in play, such as the standard or burden of proof being elevated in this second proceeding. The factual findings of the Conversion Order are merely being applied to another legal question. Further, unlike in the case of a judgment entered by confession, consent, or default, where the issues are not actually litigated, there was a multi-day trial held upon the conversion motion, evidence was presented, and primarily as a result of Smith's own testimony with respect to factual matters based on his knowledge as a representative of the Target Companies, the Court made the factual findings which support the Conversion Order and which the Trustee now seeks to apply to consolidation. Accordingly, the Court may apply collateral estoppel

to bar relitigating those issues now. *Bush v. Balfour Beatty Bahamas (In re Bush)*, 62 F.3d 1319, 1323 (11th Cir. 1995).

3. <u>The determination of the issue in the prior litigation must have been "a critical and necessary part" of the judgment in the first action.</u>

Although this "critical and necessary" element has not been well-defined, it appears to mean that the factual finding was essential to the ultimate decision in the prior case, and that the judgment could not have been entered without it. *Dimmitt & Owens Fin., Inc. v. Green (In re Green)*, 262 B.R. 557, 567 (Bankr. M.D. Fla. 2001). The factual issues the Trustee is relying upon in support of consolidation are the same findings that the Court explicitly relied upon in entering the Conversion Order and were undeniably "critical and necessary" or "essential" to the resolution of the conversion proceedings.

4. <u>Common identity of the parties.</u>

The Eleventh Circuit will not bind a non-party to a prior decision "unless he had sufficient identity of interest with a party that his interests are deemed to have been litigated." *Herman v. South Carolina Nat'l Bank*, 140 F.3d 1413, 1424 (11th Cir. 1998) (quoting *In re Birmingham Reverse Discrimination Employment Litigation*, 833 F.2d 1492, 1498 (11th Cir. 1987)). Relevant case law suggests that, under certain circumstances, a judgment may bar a subsequent action by a person who was not a party to the original litigation. *See, e.g., Meza v. General Battery Corp.*, 908 F.2d 1262, 1265 (5th Cir. 1990); *Kaiser Aero. & Elecs. Corp. v. Teledyne Indus., Inc.*, 229 B.R. 860, 872 (S.D. Fla. 1999).

For the reasons set forth above, the Court has already found that the Target Companies and the Debtor share a substantial, common identity of interests and so this prong of the collateral estoppel analysis is satisfied.

5. <u>Opportunity to be heard.</u>

Smith and GES were parties in interest to the conversion proceedings, as both were listed on the creditor matrix on the date of filing,[81] and they were provided with formal notice.[82] While the other Target Companies had not yet formally appeared in the case, Smith personally attended and testified at the hearings on the Motion to Convert. Smith is the principle, majority shareholder, and president of each of the Family Members and necessarily serves as their representative. Service upon each of the Target Companies is delivered to Smith as their representative and is sent to the same address for each entity.[83] Practically speaking, additional service on the Target Companies at the time of the Conversion Proceedings would have amounted to little more than Smith receiving another envelope with identical materials. As the principal, majority shareholder, president, and representative of each of the Family Members, Smith is in the best (and possibly only) position to understand and represent the interests of the Family Members. To the extent that conversion may have had an impact on any of their interests as creditors, related entities doing

---

[81] (Doc. 6).

[82] (Docs. 70 at 11; 116 at 6-7).

[83] (Docs. 389; 393; 424).

business with the Debtor, or otherwise, it was Smith's duty to represent those interests, or hire counsel to do so, and he chose to take no action.[84]

While the Target Companies may not have formally appeared or filed claims at the time of the hearings on the Motion to Convert, they were in fact represented by Smith at the hearings, and so not only had notice of the conversion hearings but were actually in attendance (although not represented by counsel) as Smith was in in attendance and testified at those hearings with respect to factual matters based on his knowledge as the representative of each of the Target Companies. It is incumbent upon Smith to represent the interests of the Family Members, and his failure to engage counsel for the specific purpose of representing the various Target Companies was at his own peril. *See Kaiser Aero. & Elecs. Corp. v. Teledyne Indus., Inc.*, 229 B.R. 860, 873 (S.D. Fla. 1999).

The Target Companies now assert that they have factual and legal defenses, but they have not set forth anything in support of this claim. While their supplemental filing claims that there are 'developments' that are relevant to consolidation, and that they "look forward to presenting defenses to substantive consolidation,"[85] no specific details, by way of affidavit or otherwise, of the foreshadowed defenses were provided. Indeed, the Target Companies' argument is

---

[84] At a minimum, the various Target Companies share, among other things, an interest in that the conversion to Chapter 7 would result in liquidation of the Debtor, and as each of these entities existed essentially for the sole purpose of conducting business with the debtor, any pecuniary interests they held in the Debtor's reorganization, rather than liquidation, was clearly at stake.

[85] (Doc. 395 at 9).

little more than a single paragraph which cites no record evidence, no case law, and no statute or other authority in support of the Target Companies' position.[86] At the first hearing on the Motion, on March 2, 2023, the Court ordered the Trustee to amend the Motion to provide specificity as to the basis for consolidation, entity by entity, and afforded the Target Companies an additional opportunity to fully brief their defenses and to oppose the *Eastgroup* and *Vecco* analyses. The Court even made clear that additional time or pages would be provided to the Target Companies upon request, yet the Target Companies' 'factual and legal defenses' are no more than bare assertions that:

> Trustee's wholesale abandonment of all of the tangible assets of the Debtor proves that the tangible assets of the Debtor have no value without the knowledge and expertise of Don Smith. As another example, in the Conversion Order, the Court does not specify which patent was transferred. One patent was abandoned after transfer, and the other was a patent application, in which the Debtor had no vested interest as a matter of law.[87]

Without further support, these statements hold little weight, but even considering them in a light most favorable to the Target Companies, the Court is mystified as to how these assertions serve to counter the Court's prior factual findings in the Conversion Order which overwhelmingly support substantive consolidation pursuant to the factors set forth in *Eastgroup* and *Vecco*.

---

[86] (Doc. 395 at 9).

[87] (Doc. 395 at 9).

The Court's prior factual findings in the Conversion Order are clear and were not appealed, the Trustee is seeking a judgment purely upon those facts found in the Conversion Order, the facts found in the Conversion Order satisfy the requirements under the various case law and their articulated tests for substantive consolidation, and the Target Companies have not presented any significant arguments, sufficiently disputed the facts or case law, or presented any additional evidence to the contrary. Instead, they have elected to make only procedural arguments which, for the reasons stated, are not persuasive.

The Target Companies have had a full and fair opportunity to participate in the conversion hearings and their representative, Smith, was, in fact, in attendance and testified at those hearings with respect to factual matters based on his knowledge as a representative of the Target Companies. Further, the Target Companies have been afforded more than a full and fair opportunity to present substantive argument in opposition to consolidation and have failed or refused to do so.

Thus, for the purposes of applying collateral estoppel principles in this case, the Court concludes that there was a sufficient identity of the parties and opportunity to be heard. Accordingly, each prong of the collateral estoppel analysis is satisfied with respect to the Target Companies.

## **CONCLUSION**

For the foregoing reasons the Court GRANTS the Trustee's Motion to Substantively Consolidate Raw Materials Corp., Raw Energy Materials, Corp., Global Energy Sciences, LLC), and Raw, LLC into the Debtor's estate and ORDERS:

Effective upon entry of this Order, the assets and liabilities of Raw Materials Corp., Raw Energy Materials, Corp., Global Energy Sciences, LLC, and Raw, LLC are substantively consolidated with the bankruptcy estate of No Rust Rebar, Inc. (the "Debtor"), with Sonya Salkin Slott as Chapter 7 Trustee over each of the consolidated entities.

# # #

Copies to:
All parties in interest.